Nancy Ann LOGAN, Appellant,

v.

The STATE of Texas.

No. 1004–01.

Court of Criminal Appeals of Texas.

Nov. 13, 2002.

Larry Warner, Brownsville, for appellant.

Matthew Paul, State's Attorney, Austin, for state.

## OPINION

HERVEY, J., delivered the unanimous opinion of the Court.

Pursuant to Section 35.02(d) of the Texas Penal Code, the punishment level for the criminal offense of insurance fraud is determined by the "value of the claim." The punishment level for this offense ranges from a Class C misdemeanor (when the value of the claim is less than $20) to a first degree felony (when the value of the claim is more than $200,000). The issue presented in this case is whether "value of the claim" in Section 35.02(d) means the entire amount of the claim or just the fraudulent portion of the claim. The Court of Appeals held that "value of the claim" in Section 35.02(d) means just the fraudulent portion of the claim. *Logan v. State,* 48 S.W.3d 296, 302–05 (Tex.App.-Texarkana 2001, pet. granted). We agree.

The evidence shows that someone intentionally destroyed appellant's home through an act of arson about five days after appellant purchased a homeowner's insurance policy. At the time of the arson, appellant's home was the subject of foreclosure proceedings by appellant's credit union. Appellant made claims under her homeowner's insurance policy for the loss

of her home and for the loss of various items of personal property.

Appellant was indicted for insurance fraud.[1] The prosecution's trial theory, as expressed in its opening statement to the jury, was that appellant made fraudulent claims under her homeowner's insurance policy for various items of personal property destroyed in the fire. The prosecution made no allegation during its opening statement that appellant was responsible for the arson or that her insurance claim for the loss of the home was improper.

I expect the evidence to show you in this case that [appellant] committed insurance fraud in that in reporting a claim that she was making for a house buyer here in Titus County and reporting that claim to State Farm she listed many items as burned up in the house when, in fact, later on there will be evidence that she was in possession of those items, the same ones that she was reporting were lost or damaged in the fire. That's "insurance fraud."

The evidence will show you that from the insurance here when she came in Kim Rayborn took her initial application then five days later there was a house fire.

Then we'll have information and testimony from Kimberly Olson from State Farm that the Inventory that lists all these items that [appellant] claimed were lost in the fire, she had to send the Inventory back to her twice because it wasn't signed and she finally got it in May 1999 after [appellant] sent it in twice unsigned, finally was signed. And that document has 50 pages to it, a list of items that [appellant] herself listed showing what was lost in the fire.

Ms. Kimberly Olson will be the witness to that.

Then we'll have other information and evidence showing the property still in her possession. And the bottom line is this claim was paid but it was paid based on the information [appellant] provided that was false information. The claim would not have been paid has she provided true information.

The State would contend that she is guilty of what she is charged with, "Insurance Fraud."

During her opening statement, appellant claimed the evidence would show, which it did, that the insurance company paid her insurance claim for the loss of the home after a "big investigation." Appellant also stated that her entire insurance claim for the loss of personal property was proper and that her indictment for insurance fraud was evidence of "how our system goes so haywire."

The evidence will show that the insurance company investigated this fire, big investigation, that they investigated it thoroughly and that they paid the Logan's claim, that they paid first the claim for the loss of the home which included the mortgage, sizable mortgage which was on their home.

The evidence will show that that same insurance representative encouraged [appellant] and her husband to include everything that they lost. The evidence will show that that agent, that representative understood how difficult it would be for somebody that had years of accu-

---

1. Section 35.02(a) provides that:
   (a) A person commits an offense if, with the intent to defraud or deceive an insurer, the person causes to be prepared or presents to an insurer in support of a claim for payment under a health or property and casu-
   alty insurance policy a statement that the person knows contains false or misleading information concerning a matter that is material to the claim, and the matter affects a person's right to a payment or the amount of payment to which a person is entitled.

mulation in drawers and boxes and attics, on the walls, in cabinets, in curio shelves, how difficult it would be to reconstruct all of that and that that representative advised them how to go about doing that; told them to go to the stores, go to department stores, go to dry goods stores, go to hardware stores, go up and down the aisles and look at things, if you see something that reminds you that you remember something you had write it down, get the price. This representative told them how to do that.

Not only that, she called them on occasions and told them, "You have only claimed such and such percentage of what you have covered, living in a home that long you are bound to have had more than this, look again, try to remember."

 &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

The evidence is going to show that these officers in ransacking [appellant's] house and running that search warrant that they went up to Bowie County to get based on that criminal allegation took items from [appellant's] home which they had to know were acquired after that fire.

When [appellant] offered to show them receipts, "I bought these things, this is where I bought them, this is when I bought them" they ignored her and they scoffed at her and just renewed their threats to send her to the penitentiary.

That's what the evidence in this case is going to show, that's what you are going to hear and when you hear this testimony you will wonder at how our system goes so haywire.

And I submit that you will live in fear of ever having that experience, the devastating aftermath of having your home and possessions burned.

The indictment charging appellant with insurance fraud alleged that the value of the claim was $200,000 or more, an offense punishable as a first degree felony. *See* Section 35.02(d)(7). The evidence shows that appellant claimed $180,000 for the loss of the home, and $108,000 for the loss of personal property, under her homeowner's insurance policy.

The insurance company paid appellant approximately $240,000 under the homeowner's insurance policy; $180,000 for the loss of the home and approximately $54,000 for the loss of personal property.

Q. And did your [insurance] company pay [appellant] as a result of this claim?

A. Yes. We did.

Q. And how much was she paid?

A. She was paid the full amount, $180,000 for the building loss, she was also paid—you can look in the file for the exact number, approximately $54,000 for property that she claimed was damaged in the lost personal property and she was paid another $14,000 for additional living expenses.

Q. So over $200,000?

A. Yes.

I think it was close to $240,000.

The prosecution presented evidence that the fire was an act of arson, but no one testified that appellant was responsible for the arson. The prosecution also presented evidence that various items of personal property that appellant claimed were lost were found in appellant's rental house after the fire. For example, the trial court admitted the following exhibits into evidence:

[THE PROSECUTION]: At this time the State would offer these items, specifically the Gone With The Wind collection and the figurines contained therein, the movies that have been marked and identified, the photo albums and [President

Reagan] Inaugural items are already into evidence and then the family photos as well, it would be *"State's Exhibits 9"* through *"28"*—*"9"* through *"28"*—*"10"* through *"28"* then.

In response to appellant's motion for a directed verdict, the prosecution asserted that one of its theories was that "the value of the [entire] claim is what determines the level of the offense." The prosecution, however, made no claim that appellant's entire insurance claim (for the home and for the personal property) was fraudulent because she was responsible for the arson.

[THE COURT]: You don't have to prove the item, is that what you are saying, the value of the items?

[THE PROSECUTION]: Yes, Your Honor, that's correct.

The value of the claim, the first paragraph says, "The value of said claim being $200,000 or more."

The statute itself speaks in terms of the value of the claim, not the value of the items.

The third paragraph, that's why it's charged in the alternative, Your Honor, the third paragraph goes on the information concerning a matter effecting (sic) the amount of payment to which [appellant] was entitled but the first one under the statute, the value of the claim is what determines the level of the offense.

The prosecution also asserted in response to appellant's motion for directed verdict that there were different ways to prove that appellant possessed personal property that she claimed was destroyed in the fire. The prosecution again made no claim that one of these ways would be to prove that appellant's entire claim was fraudulent because she was responsible for the arson.

[APPELLANT]: Again, all that aside, there is not even circumstantial, there is no evidence other than conjecture that anything listed on *"State's Exhibit Number 3"* was not, in fact, lost in that fire.

There's a lot of conjecture, they brought photographs, they brought some plastic figurines, everybody said—"These things, is that the only one in the whole wide world?"

"No. You can get them in any store."

And they brought no one that pointed at anything and said, "This is something that was in that house that's on that list and it wasn't lost."

[THE PROSECUTION]: There's no legal requirement that we do that, the case may be proved in a variety of ways and I think also if you look at the items themselves the uniqueness of the item and the fact that these are the same ones listed to support the circumstantial inference that they are the same items, the presidential matters, the movies that were listed years old and the same titles, the figurines of a certain kind and then they are the same ones in possession in possession of [appellant].

I think taking all that together, the photo albums—when you take all that evidence together it does support in a circumstantial and legal way that that was a false statement in the Inventory.

Also the fact that these were the kind of items that would burn up in a house fire also supports the fact that it would be a fraudulent claim.

The fact that [appellant] is in possession of those items shows the falsity of that claim as well as the uniqueness and taken together the items listed on the Inventory, the same as she has got after the fire.

During closing jury arguments, the prosecution argued that appellant's posses-

sion of personal property that she claimed was lost in the fire made this an insurance fraud case. The prosecution never expressly claimed (though it may have suggested it) that appellant was responsible for the arson.

**That's another issue that has to make you examine the date of no insurance, you get insurance and five days later the house burns to the ground** and then when the search warrant recovers all these items lo and behold items that would be burned up in a house are here, specific items, sentimental items, family items, family Bible, family photos, those items are still with us.

That's what makes this an insurance fraud case.

[The insurance adjuster] testified that had she known that these items were still in the possession of [appellant] they would not have paid the claim. Those are the misrepresentations made.

\*       \*       \*       \*       \*       \*

And all the evidence that you have shows you that those [items of personal property] were in the residence, [appellant] claimed them to be in the residence that suffered the fire.

**[Appellant and her husband] were behind on their house note, we know that as well.**

**So when you take the fact at first they didn't have any insurance then they got insurance, five days later it burned and they were behind on their house note,** that's the type evidence you have in an insurance fraud case along with the property that was located in [appellant's] possession afterwards.

So if you take a look at all that evidence you see many kinds of evidence, many supporting facts in the evidence of unique items and specific items that are listed that [appellant] still had possession of.

Using your common sense and the evidence that you had you can see that this Inventory is fraudulent, the Inventory does not match the facts that we know them to be now being that she had got quilts, got the home movies, the photographs, the family Bible, the Ronald Reagan items, still has them.

That's a false claim and [appellant] says she lost them.

(Emphasis Supplied).

Appellant argued during closing jury arguments that the prosecution knew that appellant's family "didn't have anything to do" with the arson.

[APPELLANT]: They know that someone burned down [appellant's] house and they know that [appellant] didn't have anything to do with it yet they come here and make those suggestions in opening argument, you know, "The house burned, it's suspicious and da, da, da, da, da," they know that somebody burned her bosses' house down a few days before, barely a week.

[THE PROSECUTION]: Your Honor, that is outside the record.

[APPELLANT]: Days before she went and got the insurance and they burned hers.

They know that [appellant didn't] have anything to do with that house burning and if that wasn't the absolute truth why don't you have some evidence up here? Why isn't there some evidence presented to show that?

Because they know it.

The prosecution argued during its final closing jury arguments, that appellant was "guilty of what she [was] charged with." The prosecution never expressly claimed (though it may have suggested it again)

that appellant was responsible for the arson.

> **The fact [appellant] had no insurance, [she] got it, five days later after [appellant] got the insurance the house burned down** and then these items on the Inventory are listed, in turn they are paid then the search warrant is run and these things are here in court right in front of you.
>
> I think with that evidence you can see this is a false claim, with that evidence you can see this is insurance fraud.
>
> I think if you remember what evidence you heard, not how it's been characterized to you, the evidence that you heard shows that [appellant] is guilty of what she is charged with.
>
> (Emphasis Supplied).

The Court's charge did not instruct the jury to make any findings on whether appellant was responsible for the arson. Rather, the Court's charge instructed the jury:

> Now, therefore, bearing in mind all of the instructions in the Court's charge, if you find and believe beyond a reasonable doubt that [appellant], on or about the 24th day of May, 1999, in Titus County, Texas, did then and there, with intent to defraud or deceive an insurer, to wit: State Farm Insurance Company, knowingly or intentionally caused to be prepared or presented to said insurer, in support of a claim for payment under a property and casualty insurance policy, a statement that said defendant knew contained false or misleading information concerning a matter material to the claim and which affected a person's right to payment or the amount of payment to which a person was entitled and the value of said claim was $200,000 or more, then you will find [appellant] guilty of the offense of insurance fraud, as charged in the indictment.

The jury convicted appellant "of the lesser offense of insurance fraud in an amount of $20,000 or more but less than $100,000" which made the offense punishable as a third degree felony. *See* Section 35.02(d)(5). At the punishment phase, the jury assessed appellant's punishment at seven years confinement with a recommendation that appellant be placed on community supervision. The trial court's judgment reflects appellant's conviction for "3rd degree" insurance fraud with a sentence of seven years probation.

On direct appeal, appellant challenged the sufficiency of the evidence to support the jury's verdict. *See Logan*, 48 S.W.3d at 299. In addressing this claim, the Court of Appeals held that "value of the claim" under Section 35.02(d) means only "the amount fraudulently claimed," which, in this case, was appellant's "claimed losses for [personal] property that was not lost" in the fire. *See Logan*, 48 S.W.3d at 303, 305, 307. The Court of Appeals then decided that the prosecution's evidence was sufficient only to support a finding that appellant fraudulently claimed that personal property worth $886 was lost in the fire. *See Logan*, 48 S.W.3d at 307. The Court of Appeals, therefore, reformed the trial court's judgment to "show that [appellant] was convicted of a Class A misdemeanor" and remanded the case for a new punishment hearing. *See id.;* Section 35.02(d)(3) (making insurance fraud punishable as a Class A misdemeanor if the value of the claim is between $500 and $1,500).

The prosecution filed a motion for rehearing in which it claimed that its proof and reasonable inferences therefrom supported a finding that appellant's entire claim for personal property was fraudulent, and, therefore, the evidence that the insurance company paid appellant $54,000

for personal property was sufficient to support the jury's verdict. *State's Motion For Rehearing* at 1 (claiming that the prosecution proved that "appellant's entire claim concerning the personal property for which she received approximately $54,000 was fabricated").[2] The Court of Appeals overruled the prosecution's motion for rehearing in a written opinion that did not address the specific claim raised in the prosecution's motion for rehearing. *See Logan,* 48 S.W.3d at 309 (op. on reh'g).

We exercised our discretionary authority to review the two grounds for review set out in the State's petition for discretionary review. The State claims in ground one that "value of the claim" in Section 35.02(d) means the entire amount of the claim and not just the fraudulent portion of the claim.[3] The State also claims in ground two that it is not even necessary to address ground one because, even if "value of the claim" means only the fraudulent portion of the claim, the evidence is still sufficient to support the jury's verdict. The State claims that this is so because its theory at trial was that appellant's entire claim was fraudulent because she was responsible for the arson.[4] The State argues:

> Even if the phrase "value of the claim" is judicially amended to read "value of

the fraudulent portion of the claim," the evidence is sufficient to support the jury's verdict. The State's theory at trial was that appellant's *entire claim* [5] ] was fraudulent, because appellant lied to the insurance company about the manner or circumstances under which the property was destroyed: the fire was not the result of an unanticipated accident, as appellant alleged, but was caused by an act of arson. The fact that appellant had removed certain items with unique personal value shortly before this "accidental" fire destroyed her house, was merely circumstantial evidence supporting the State's theory that appellant had intentionally burned down her house, and then lied to the insurance company about the cause of the fire, i.e., that the entire claim was fraudulent.

We disagree. The portions of the record set out above demonstrate that the prosecution very carefully avoided squarely presenting to the jury the legal theory that appellant's entire claim was fraudulent because she was responsible for the arson. We, therefore, decline to affirm the trial court's judgment and the jury's verdict on this theory. Ground two is overruled.

■ What is squarely before the Court, therefore, is the statutory meaning of "val-

---

2. The prosecution did not raise this claim on discretionary review, and we express no opinion on it.

3. The State's first ground for review states: Pursuant to Penal Code [Section] 35.02 (Insurance Fraud), is the offense level determined by the value of the claim, or by the value of the fraudulent portion of the claim?

4. The State's second ground for review states: Where the State presents circumstantial evidence that would allow a rational jury to conclude that the defendant's entire insurance claim was fraudulent (i.e., that the defendant, with the intent to defraud or

deceive, made a statement in support of an insurance claim that contained false or misleading information as to whether the property was damaged or destroyed in the manner and under the circumstances described in the statement, and thus affected the defendant's right to payment of the entire claim), in order to prove the value of the claim must the State prove the value of each specific item of property stated in the claim, and further show that each of those specific items of property was not actually lost or damaged?

5. Emphasis in Original.

ue of the claim" in Section 35.02(d). The State claims here, as it did in the Court of Appeals, that we should follow the decision of the Wisconsin Court of Appeals in *State v. Briggs* which decided that "value of the claim" under Wisconsin's insurance fraud statute, refers to the entire amount of the claim and not just the fraudulent portion. *State v. Briggs*, 214 Wis.2d 281, 571 N.W.2d 881, 885 (Ct.App.1997). The Wisconsin Court based its decision on the "plain" language of the statute and a desire to exercise judicial restraint by not legislating from the bench. *See id.* (statute is clear on its face and whether it "is wise is not for [the courts] to decide" because the legislature "is the body to undertake such an endeavor"). The State argues that, as in *Briggs*, the "plain" language of Section 35.02(d) requires us to construe "value of the claim" to mean the entire amount of the claim and that judi-cially construing it to mean otherwise would be legislating from the bench.

The Court of Appeals declined to follow *Briggs* based on its observation that the Wisconsin punishment scheme does not lead to "absurd results" while Texas' punishment scheme does lead to "absurd results." *See Logan*, 48 S.W.3d at 303–05. The Court of Appeals believed that the State's construction of Section 35.02(d) would open the door to a parade of horribles such as an insured being subject to punishment for a first degree felony because of a $20 fraud on a $200,000 insurance claim. *See Logan*, 48 S.W.3d at 303.

Appellant seems to concede that the "plain" language of Section 35.02(d) does not favor her construction of "value of the claim" to mean only the fraudulent portion of the claim. She nevertheless claims that several extratextual sources support her construction of the statute. She claims, among other things, that the incremental punishment scheme of Section 35.02(d) is consistent with the incremental punishment scheme of the general theft statute in Section 31.03(3), Texas Penal Code of Criminal. She argues:

All the words in the statute must be considered. The conclusion to be drawn from all the words in [Section 35.02(d) ], the classification scheme, making the offense incrementally more serious as the value of "the claim" increases, is that the legislature must have intended to mean the fraudulent portion of the claim. This interpretation is consistent with the incremental punishment system of the general theft statute, [Section 31.03(e), Texas Penal Code]. It is consistent with the incremental punishment system of the theft of service statute, [Section 31.04(e), Texas Penal Code]. It is consistent with the incremental punishment system of the hindering of secured creditors statute, [Section 32.33(e), Texas Penal Code]. It is consistent with the incremental punishment system of the fraudulent transfer of a motor vehicle statute, [Section 32.34(f), Texas Penal Code]. It is consistent with the incremental punishment system of the statute proscribing Credit Card Transaction Record Laundering, [Section 32.35(f) ]. It is consistent with the incremental punishment system of the statute proscribing Misapplication of fiduciary Property or Property of a Financial Institution, [Section 32.45(c), Texas Penal Code]. It is consistent with the incremental punishment system of the statute proscribing Securing the Execution of a Document by Deception, [Section 32.46(b), Texas Penal Code]. It is consistent with the incremental punishment system of the statute proscribing Theft of Telecommunications Service, [Section 33A.04(b), Texas Penal Code].

The State responds that the incremental punishment scheme in Section 35.02(d) is different from those set out above in appellant's brief (particularly the incremental punishment scheme of the general theft statute) and is more like the Issuance of a Bad Check (Section 32.41, Texas Penal Code,) or False Statement to Obtain Property or Credit (Section 32.32, Texas Penal Code) punishment schemes which do not turn on the value of property fraudulently obtained or the amount of pecuniary loss. The State essentially claims that, because the gravamen of the offense of insurance fraud is the making of a false statement (and not the unlawful acquisition of property), its offense level should be determined by the value of the entire claim and "not by the amount of payment by the insurance company that is proven to have been obtained by fraud or deceit." The State argues:

> If the Legislature had wanted to make the offense level turn on the amount of the fraudulent portion of the claim or the pecuniary loss to the insurance company, it could have done so by employing language similar to that chosen for other penal provisions. [Comparing Section 35.02(d)'s "value of claim" with Section 31.03 (theft statute making offense level determined by "the value of the property stolen")]; Section 28.03 (criminal mischief statute making offense level determined by "the amount of pecuniary loss"). And Section 28.06 (Defining Pecuniary Loss)
>
> For the offenses listed above, the Legislature made the value of the property stolen or the amount of pecuniary loss determinative of the offense level, and carefully calibrated that factor to account for the actor's legitimate interest in the property. That is because the gravamen of these offenses is the unlawful acquisition of, or inflicting damage upon, another's property. These crimes

should be contrasted with offenses in which the gravamen of the offense is deceit or the making of a false statement. [See Section 32.32 (False Statement to Obtain Property or Credit) (offense level not determined by value of property or credit, or amount of pecuniary loss); Section 32.41 (Issuance of Bad Check) (same).]

Insurance Fraud is similar to False Statement to Obtain Property or Credit, and Issuance of Bad Check. The gravamen of the offense is not the unlawful acquisition of property, but the making of a false statement. Thus, just as with the latter two offenses, neither the value of the property fraudulently claimed to have been lost, nor the amount of pecuniary loss, are determinative of the offense level under [Section] 35.02. The offense is complete when a statement containing false or misleading information is presented in support of a claim, and the offense level is determined by the value of that claim, not by the amount of payment by the insurance company that is proven to have been obtained by fraud or deceit.

■ We normally construe a statute according to its "plain [textual] meaning" without resort to extratextual sources. *See Boykin v. State*, 818 S.W.2d 782, 785 (Tex.Cr.App.1991). We will, however, resort to extratextual sources such as legislative history to construe a statute if we decide that the statute is ambiguous or that construing the statute according to its "plain [textual] meaning" will lead to "absurd consequences." *See Jordan v. State*, 36 S.W.3d 871, 873 (Tex.Cr.App.2001). These general rules of statutory construction are aids to effect our overriding constitutional duty to effectuate what the Legislature intended when it enacted the statute. *See Boykin*, 818 S.W.2d at 785.

Here, "value of the claim" as expressed in Section 35.02(d) is ambiguous primarily because it is reasonably susceptible to the different meanings advocated by the parties in this proceeding. The statute makes insurance fraud a criminal offense; however, its language arguably punishes non-fraudulent conduct. *See Logan*, 48 S.W.3d at 305 (in insurance fraud cases like this where the value of the property shown to have been fraudulently claimed is much lower than the amount claimed under the insurance policy, the resulting punishment does not reflect the scope of the fraud). We will, therefore, resort to extratextual factors to construe "value of the claim."

Our review of the legislative history of Section 35.02 indicates that the Legislature did not squarely consider or address the issue presented by this case. We agree with the Court of Appeals' common sense observation that it "is likely that in most insurance fraud cases, the value of the property fraudulently claimed to have been lost will approximate the amount claimed under the insurance policy." *See Logan*, 48 S.W.3d at 305. The Legislature also must have understood this when it enacted the insurance fraud statute set out in Section 35.02. This is some evidence that the Legislature intended for "value of the claim" to mean the amount fraudulently claimed since this would be the case in most insurance fraud situations.

The legislative history of Section 35.02 also lends some support for this. In explaining HB 1487 (current Section 35.02) in a public hearing before the House Criminal Jurisprudence Committee, one of the bill's authors (Representative Counts) explained that making false insurance claims is a crime based upon the "amount of the false claim." [6] The witnesses testifying in support of HB 1487 described various scenarios (usually involving organized insurance fraud rings where the entire claim is fraudulent) that HB 1487 was meant to address.[7]

Don Clemmer, an Assistant Attorney General, also testified before the House Criminal Jurisprudence Committee that the theft and fraud statutes were inadequate to address the problem of organized insurance fraud rings. He testified that HB 1487 was targeted to people "who do this for a living" and not to the "one-time small offender." He also testified that the punishment levels were "very straightforward" and were "tied to the theft statute." [8] Subsequent House Criminal Jurisprudence Committee and Sub-committee hearings, House floor hearings, Senate Economic Development Committee hearings, and Senate Floor hearings did not contradict any of this except for the misdemeanor punishment levels being left in HB 1487 (making it applicable to a "one-time small offender") despite the efforts of some (most notably Representative Nixon) to have them removed.[9]

---

**6.** Hearings on HB 1487 before the House Criminal Jurisprudence Committee, 74th Leg., R.S., on March 27, 1995. (Tape 1, side B, at 004–546, 010–012).

**7.** *Id.* (Tape 1, side B, at 038–382).

**8.** *Id.* (Tape 1, side B, at 382–436).

**9.** Hearings on HB 1487 before the House Criminal Jurisprudence Committee, 74th Leg., R.S., on April 3, 1995.

Hearings on HB 1487 before a House Criminal Jurisprudence Subcommittee, 74th Leg., R.S., on April 10, 1995.

Hearings on HB 1487 before the House Criminal Jurisprudence Committee, 74th Leg., R.S. on April 19, 1995.

House hearings on HB 1487, 74th Leg., R.S. on May 8, 1995.

House hearings on HB 1487, 74th Leg., R.S., on May 9, 1995.

Hearings on HB 1487 before the Senate Economic Development Committee, 74th Leg., R.S., on April 19, 1995. (Tape 1, side 2,

The House Committee Bill Analysis for HB 1487 states that Section 35.02 was intended as "a more comprehensive method for police and prosecutors to use in processing cases than employing **Theft or other existing Fraud statutes.**" This Bill Analysis further indicates a legislative concern that under "the older statutes, a cooperating victimized insurance company might be required to disburse proceeds to the criminals **in order to prove a completed theft**" which did not guarantee prosecution of all those involved.[10]

Thus the legislative history indicates that the Legislature intended for the insurance fraud statute to be like the general theft statute in Section 31.03 (or a specialized version thereof) since the Legislature was concerned that under the older statutes an insurance company might have to pay the money "to the criminals in order to prove a completed theft." The legislative history also indicates that the Legislature intended the punishment levels of an insurance fraud case to be "tied to" those for a general theft case. This is significant because, as both parties in this proceeding seem to agree, the incremental punishment scheme of the general theft statute turns on the value of the property stolen. *See also State v. Weaver,* 982 S.W.2d 892, 894–95 (Tex.Cr.App.1998) (discussing 63rd Legislature's consolidation of various separately defined theft offenses into one general theft offense that said "thou shalt not steal").

An examination of other nontextual legislative history sources does not contradict this. The House Research Organization Bill Analysis of HB 1487 summarized the debate between the supporters and opponents of the bill. This debate centered on whether "current theft statutes and other provisions [had] proven inadequate to deal with [the] unique problem" of insurance fraud. Supporters of the bill claimed that current theft statutes were inadequate to deal with the problem of insurance fraud while opponents of the bill claimed otherwise.

Specifically, the debate centered on proving the gravamen of the offense of making false statements and not on the meaning of "value of the claim." The House Research Organization summarized the position of the supporters of HB 1487 as follows:

CSHB 1487 is necessary to combat the serious problem of insurance fraud that costs the industry and consumers billions of dollars each year. The problem of insurance fraud affects consumers as well as companies and drives up the cost of polices (sic). By deterring insurance fraud, CSHB 1487 would reduce the cost of insurance for consumers.

Prior to the 1993 Penal Code revisions the statutes had a specific provision for insurance fraud. It is necessary to restore an offense for insurance fraud because current theft statutes and other provisions have proven inadequate to deal with this unique problem

at 035–060, 050–055) (Senate sponsor (Montford) of HB 1487 explaining that HB 1487 is "structured similar to the theft statute" in that the degree of "corresponding penalty upon conviction would be relegated" to the same schedule as a theft case).

Senate Hearings on HB 1487, 74th Leg., R.S., on May 9, 1995.

House Research Organization, Bill Analysis of HB 1487, 74 th Leg., R.S. (May 8, 1995)

(one proposed change made to HB 1487 during the legislative process was the elimination of "misdemeanor offenses for claims less than $1,500").

10. House Committee on Criminal Jurisprudence, Bill Analysis of HB 1487, 74th Leg., R.S. (April 19, 1995) (Emphasis Supplied).

**630**

Insurance fraud can be difficult to prosecute because there often are no witnesses, and it is usually perpetrated through false reports and statements. CSHB 1487 would make this kind of fraud easier to prosecute and allow prosecutors to focus on statements that persons know are false and are done with intent to defraud or deceive an insurer. This bill would go after persons trying to defraud insurance companies and would not penalize persons who make an honest mistake on an insurance claim.

The House Research Organization summarized the position of the opponents of HB 1487 as follows:

It is unnecessary to create a specific offense for insurance fraud. The situations described in CSHB 1487 are already covered by Penal Code provisions on theft and giving false statements to obtain property or credit. This bill would be a step backward from the 1993 Penal Code revisions that established broad categories of offenses and eliminated many special provisions. CSHB 1487 could actually make fraud prosecution *more* difficult by requiring prosecutors to meet the specific standards in the bill instead of the more general standards already in the Penal Code.

(Emphasis in Original).[11]

The Senate Economic Development Committee Bill Analysis of HB 1487 analyzed the bill as setting forth "a staggered schedule of offenses contingent on the dollar amount of the **fraudulent** claim." [12] This ties the dollar amount (i.e., the "value of the claim") to the fraudulent portion of the claim.

We conclude that the Legislature meant "value of the claim" in Section 35.02(d) to mean the fraudulent portion of the claim. Recognizing that our duty is to give effect to what the Legislature intended when it enacted the statute, we so hold. *See Boykin*, 818 S.W.2d at 785.

The judgment of the Court of Appeals is affirmed.

**11.** House Research Organization, Bill Analysis of HB 1487, 74 th Leg., R.S. (May 8, 1995).

**12.** Senate Economic Development Committee, Bill Analysis of HB 1487, 74th Leg., R.S., (May 18, 1995) (Emphasis Supplied).