In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-06-00483-CR

NO. 01-06-00484-CR

____________


ROGER MARCUS, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 339th District Court 

Harris County, Texas

Trial Court Cause Nos. 1025501 and 1053595 





MEMORANDUM OPINION


 A jury convicted appellant, Roger Marcus, of arson of a building (trial cause
no. 1053595 and appellate cause no. 01-06-00483-CR) and insurance fraud (trial
cause no. 1025501 and appellate cause no. 01-06-00484-CR). The jury assessed
punishment at seven years' confinement and a $10,000 fine for arson, and ten
years' confinement and a $10,000 fine for insurance fraud. In six points of error,
appellant contends that (1-4) the evidence is legally and factually insufficient to
support the conviction for insurance fraud, (5) the trial court erred by denying
appellant's motion to suppress his written and oral statements, and (6) trial counsel
rendered ineffective assistance. We affirm.

BACKGROUNDThe Fire

 On June 15, 2004, appellant purchased the Blessed Again Thrift Store from
Tom Coleman for $75,000. Appellant paid $20,000 down, promised to pay
another $5,000 within 45 days, and then to pay monthly installments of $1,567 for
36 months. The store was one of several businesses located in a commercial
building owned by David Vise. Appellant, a minister, also held church services in
a separate ballroom he rented elsewhere in the building. The business struggled.
Over the next several months, appellant fell behind in his payments on the
business. On March 22, 2005, Coleman evicted appellant, but then allowed him to
reenter the property in return for a partial payment of $6,000. Despite his financial
difficulties, in January 2005, appellant attempted unsuccessfully to buy the entire
building directly from Vise.

 In December 2004, appellant had purchased insurance on the store in the
amount of $100,000 for the premises and $150,000 for his property, for a total of
$250,000. The policy covered damage from accidental fire, but not from arson. 
Appellant kept the premiums paid, even when he fell behind in his payments to
Coleman. Appellant suggested to Coleman that he should get insurance too, but
Coleman did not. Appellant was the only occupant of the building who had
insurance. Appellant claimed he decided to buy insurance after the roof was
damaged in a storm.

 In March 2005, appellant complained to Robert Loving that business was
bad and said that he needed money to get out and start a new trailer park venture.
Appellant asked Loving if he knew anyone who would burn down the store. When
Loving replied that he did not associate with people like that, appellant claimed
that he was just joking.

 Around the same time, appellant had a similar conversation with Stacy
O'Daniel, in which he complained of money problems and expressed a desire to
collect insurance on the store in order to start a new business. He asked O'Daniel
to burn the store, promising her $1000 and a job, and she initially agreed. 
Appellant showed O'Daniel around the store, pointing out flammable paint thinner. 
He showed her a back door through which she could enter, instructed her to break
the padlock with a crowbar, and told her that the security cameras would be turned
off. Meschelle Betros, O'Daniel's friend who was to accompany her on the job,
confirmed much of O'Daniel's testimony and added that appellant wanted to
"smoke up the place" so that he could collect insurance money. On the night of
April 15th, O'Daniel and Betros drove to the store, but got frightened and decided
not to go through with the plan.

 Appellant then spoke to Quinton Fontenette, a homeless man whom he had
previously met at the store. Fontenette agreed to set the fire. He testified that
appellant told him to light the clothes near where the paint thinner was stored and
assured him that the cameras would be turned off. Appellant promised him $200
and gave him power tools to pawn for cash. A pawn shop owner later testified to
seeing a man matching appellant's description drive Fontenette to his store. The
shop owner identified the items pawned and produced a receipt.

 Testifying at trial, appellant admitted to having conversations with these four
witnesses, but said he was just joking or "insinuating" and denied that he ever
directly asked anyone to set a fire.

 In the days before the fire, appellant discounted prices steeply, even though
he had never held such sales before. He also removed televisions and other high-value items from the building.

 Shortly after midnight on April 19th, Fontenette entered the building
through the back door, breaking the lock as appellant had instructed him. He set
fire to the clothes in the storage area and fled. The fire spread and soon engulfed
most of the building. Firefighters arrived on the scene and attempted to enter, but
were forced to back off when the roof partially collapsed. There were no injuries,
but damage to the building was nearly total. Fire investigators quickly concluded
the blaze had been intentionally set. They recovered the security camera footage,
but found that the system had been turned off two weeks before the fire. Appellant
admitted at trial that he had shut off the cameras.

The Investigation

 Appellant reports a loss to his insurance agent and speaks to investigators

 Appellant arrived at the scene of the fire and spoke with investigator Kuehl.
Kuehl testified that their conversation was interrupted when Fontenette approached
and appellant left to talk with him privately. According to Fontenette, appellant
told him the fire was "perfect." Later that day, appellant called his insurance agent
to report that his store had burned and that it was a "total loss." According to the
agent, appellant said "I need to file a claim." The agent initiated the claim process. 
Appellant, however, claims that he merely called to report the loss, but did not
actually file a claim. 

 On April 23rd, fire investigator Tom Frankum, representing Penn-America
Insurance, interviewed appellant and other witnesses. According to Frankum,
appellant told him he was not aware of anyone who would want to set the fire
intentionally.


 Appellant gives a statement

 On the evening of April 28th, arson investigators called appellant and asked
him to come to their office and answer questions. By this point, they had already
spoken to Loving and O'Daniel and suspected that appellant might have had some
involvement with the fire. Appellant, along with his wife Anne, arrived at the
station around 9:25 p.m.

 The interview was conducted by senior investigator D. Deutsch, with L.
Blevins assisting. Although the exact duration of the interview is unclear, it seems
to have lasted approximately two and a half hours. During this interview, appellant
produced a written statement, in which he admitted his involvement in the fire. 
One hour and forty minutes of the interview was recorded on video and audiotape. 
Deutsch later testified that "within eight minutes" appellant began making
statements that indirectly suggested his involvement in the fire. The beginning of
their conversation was not recorded, and it is not clear how long they spoke before
turning on the tape.

 As the tape begins, appellant has already admitted some sort of conversation
with Stacy O'Daniel, and Deutsch is speaking of "damage control." Within four
minutes, appellant admits speaking to Fontenette, though claiming not to know his
name. At nine minutes, appellant admits that he arranged the fire, but denies that
insurance money was his motive. At 15 minutes, Deutsch begins encouraging
appellant to make a written statement. At 25 minutes, appellant begins writing and
the investigators leave him alone in the room. He writes for about 8 minutes,
producing the first paragraph on page 2 of State's Exhibit 56, in which he admits to
asking Fontenette to set the fire. At this point, Mrs. Marcus first enters the room;
she remains for most of the rest of the interview. At 33 minutes, the investigators
return to the room, and appellant reads the paragraph out loud. Deutsch asks him
to add more specific details about the tools he gave to Fontenette, and he writes
those down. After further conversation, at 48 minutes, Deutsch asks appellant to
add a physical description of Fontenette, and appellant complies. They converse
for another 30 minutes. At 78 minutes, Deutsch turns to the first page of the
statement and begins reading to appellant the pre-printed statutory rights. He reads
each warning, asks if appellant understands it, and has appellant initial next to it. 
At 80 minutes, appellant signs his name on page 3 of the statement, and Deutsch
and Mrs. Marcus sign as witnesses. They converse for a further 20 minutes. At
100 minutes the interview ends, and everyone present leaves the room.

 Appellant "postpones" his claim

 Two days later, on April 30th, appellant e-mailed Tom Frankum asking him
to "postpone" his insurance claim. On May 2nd, appellant was charged with arson
and insurance fraud. Fontenette, meanwhile, pleaded guilty to the arson; he later
testified for the State at appellant's trial.

 Appellant moves to suppress his statement

 At trial, the defense moved to suppress appellant's written statement as well
as the video and audio tapes. The trial court conducted a suppression hearing
outside the presence of the jury. After hearing testimony from investigators
Deutsch and Blevins as well as from appellant, the court ruled the evidence
admissible. At trial, the statement was read and portions of the tape were played
for the jury.

Legal and Factual Sufficiency of Insurance Fraud Conviction

 In points of error one and two, appellant argues that the evidence is legally
insufficient to support his conviction for insurance fraud; in points three and four,
he argues that the evidence is factually insufficient. (1) 

Legal Sufficiency

 In evaluating the legal sufficiency of the evidence, we view the evidence in
the light most favorable to the verdict and determine whether any rational trier of
fact could have found the essential elements of the offense beyond a reasonable
doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979);
Drichas v. State, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005). The standard is
the same for both direct and circumstantial evidence. King v. State, 895 S.W.2d
701, 703 (Tex. Crim. App. 1995). We consider all the evidence presented at trial,
whether it was properly or improperly admitted. Johnson v. State, 967 S.W.2d
410, 412 (Tex. Crim. App. 1998). We may not re-weigh the evidence and
substitute our judgment for that of the factfinder. King v. State, 29 S.W.3d 556,
562 (Tex. Crim. App. 2000).

 At the time of the offense, the relevant portions of Tex. Pen. Code Ann. §
35.02 read as follows:

 (a) A person commits an offense if, with intent to defraud or deceive
an insurer, the person causes to be prepared or presents to an insurer in
support of a claim for payment under a health or property and casualty
insurance policy a statement that the person knows contains false or
misleading information concerning a matter that is material to the claim, and
the matter affects a person's right to a payment or the amount of payment to
which a person is entitled.

 (c) For purposes of Subsection (a), information concerning a matter
that is material to a claim for payment under an insurance policy includes
information concerning:

 (8) whether property was damaged or lost in the manner and under the
circumstances described in a statement related to a claim for insurance
payment. (2) 

 In this case, the false statement that formed the basis for the charge of
insurance fraud was appellant's oral declaration to insurance investigator Tom
Frankum that he was "not aware of anyone wanting to intentionally set a fire" in
his business. The statement was related to the insurance claim appellant had
initiated when he called his agent to report the loss. Because the policy would pay
for accidental fires but not for deliberate arson, this statement was material and
affected his claim for payment. (3) Four witnesses testified that appellant asked them
to set a fire; two of these (O'Daniel and Betros) recalled that he specifically
mentioned collecting insurance money.

 In addition to the witness testimony, ample circumstantial evidence
supported the inference that appellant planned the fire in order to commit insurance
fraud. A defendant's intent may be inferred from his actions, words, and conduct.
Nguyen v. State, 177 S.W.3d 659, 664 (Tex. App.--Houston [1st Dist.] 2005, pet.
ref'd). In Nguyen, the defendant falsely reported to her insurance agent that her car
had been stolen, when in fact she had destroyed it, and filed documents in order to
make a claim. Id. When combined with evidence of what had actually happened
to the car, this was sufficient for a rational factfinder to infer that she intended to
commit insurance fraud. Id. at 664-65.

 The elements of insurance fraud, including the intent to defraud, can be
inferred from circumstantial evidence. See Logan v. State, 48 S.W.3d 296, 301-02
(Tex. App.--Texarkana 2001), aff'd on other grounds, 89 S.W.3d 619 (Tex. Crim.
App. 2002); Obigbo v. State, 6 S.W.3d 299, 305 (Tex. App.--Dallas 1999, no
pet.). In Obigbo, the sheer implausibility of the defendant's insurance claim--that
expensive clothes worth $10,000, a sum that conveniently matched his policy
limits, were stolen from his rental car, although nothing else was stolen, and that he
happened to have receipts for them, when he appeared to lack the means to
purchase such items, and the stores shown on the receipts did not actually
exist--could support the jury's inference of intent to defraud. 6 S.W.3d at 306-07.
In Logan, intent to defraud was inferred from evidence that the defendant was
facing foreclosure, that she was seen moving personal property out of her house
before the fire, and that she tried repeatedly to avoid placing her signature on her
loss claim form and thus affirming that it was true. 48 S.W.3d at 300-01. 

 In our case, the jury could similarly infer an intent to commit insurance
fraud from the fact that appellant purchased insurance only four months before the
fire, that he always paid the insurance premiums even when he was unable to pay
his note on the business, that he held a sale shortly before the fire, and that he was
seen moving expensive items out of the store days before the fire.

 Behavior that is inconsistent with a legitimate insurance claim, as observed
by witnesses experienced in handling such claims, may also support an inference
of intent to defraud. Adelaja v. State, No. 14-05-00544-CR, 2006 WL 3486856, at
*2 (Tex. App.--Houston [14th Dist.], December 5, 2006, no pet.) (police sergeant
testified that defendant showed no interest in apprehending persons who had
allegedly stolen his car, and refused to sign a written statement); Abbott v. State,
No. 12-04-00085-CR, 2007 WL 172078, at *3-4 (Tex. App.--Tyler, January 24,
2007, no pet.) (owner of wrecking service testified that it was unusual for
defendant to retrieve his "stripped" vehicle himself rather than letting his insurance
company handle it). In this case, insurance agent Regan Latta testified that
appellant's attempt to withdraw or "postpone" his claim on April 30th was highly
unusual: policyholders might sometimes forego making claims for minor losses so
as not to raise their premiums, but not for a catastrophic loss such as this one. In
considering circumstantial evidence, jurors are "free to use their common sense
and apply common knowledge, observation, and experience . . . when giving effect
to the inferences that may reasonably be drawn from the evidence." Obigbo, 6
S.W.3d at 306. 

 Viewing the evidence in the light most favorable to the verdict, a rational
factfinder could have concluded beyond a reasonable doubt that appellant made a
false statement in support of his insurance claim and that he intended to deceive his
insurer.

Factual Sufficiency

 When conducting a factual-sufficiency review, we view all of the evidence
in a neutral light. Cain v. State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997). We
will set the verdict aside only if (1) the evidence is so weak that the verdict is
clearly wrong and manifestly unjust, or (2) the verdict is against the great weight
and preponderance of the evidence. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim.
App. 2000). Under the first prong of Johnson, we cannot say that a conviction is
"clearly wrong" or "manifestly unjust" simply because, on the quantum of
evidence admitted, we would have voted to acquit had we been on the jury. 
Watson v. State, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006). Under the second
prong of Johnson, we cannot declare that a conflict in the evidence justifies a new
trial simply because we disagree with the jury's resolution of that conflict. Id.
Before finding that the evidence is factually insufficient to support a verdict under
the second prong of Johnson, we must be able to say, with some objective basis in
the record, that the great weight and preponderance of the evidence contradicts the
jury's verdict. Id. In conducting a factual-sufficiency review, we must also
discuss the evidence that, according to the appellant, most undermines the jury's
verdict. Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003). The factfinder
alone determines what weight to place on conflicting testimony because that
determination depends on the factfinder's evaluation of witnesses' credibility and
demeanor. Cain, 958 S.W.2d at 408-09. As the sole determiner of the credibility
of the witnesses, the factfinder may choose to believe all, some, or none of the
testimony presented. Id. at 407 n.5.

 The State presented substantial evidence, as described above, to establish
appellant's guilt. This evidence was not so weak as to make the jury's verdict
wrong or unjust. Nor was there anything of significance--aside from appellant's
own testimony--that contradicted the great weight of the state's case. A jury need
not give credence to a defendant's self-serving testimony. See Lee v. State, 964
S.W.2d 3, 10 (Tex. App.--Houston [1st Dist.] 1997, pet. ref'd). The jury was
entitled to believe the testimony of four witnesses that appellant had asked them to
set a fire, and to disbelieve his denial, especially after he conceded that he could
not "disagree with their interpretation" of their conversations with him and
admitted asking Fontenette to set the fire. Appellant's insistence that he merely
reported a loss but did not file a claim is not credible: two witnesses from the
insurance agency (Regan Latta and Christina Southerland) testified that on the day
of the fire, he called them and said "I need to file a claim." (4) It was only after
appellant had admitted his involvement in the fire to investigators that he e-mailed
Frankum and asked to "postpone" his claim.

 Appellant testified that he decided to buy the insurance because he had
suffered storm damage to his roof the previous year; roof damage confirmed by
Tom Coleman's testimony. But, the jury could reasonably have inferred a criminal
purpose, taking note of the fact that he obtained the insurance only a few months
before he arranged the fire. Miller v. State, 566 S.W.2d 614, 617-18 (Tex. Crim.
App. 1978) (fact that defendant increased his insurance coverage two months
before fire was one of several pieces of circumstantial evidence from which jury
could infer intent to commit arson and collect insurance). Even after admitting his
involvement with the fire, appellant repeatedly denied that insurance was his
motive, yet he never proposed any other reason why he would want the store
burned.

 Because the evidence is both legally and factually sufficient to support the
conviction for insurance fraud, we overrule points of error one through four.

Statement Inadmissible Because of Miranda Violation?

 In point of error five, appellant argues that the trial court erred in denying his
pretrial motion to suppress his written statement and the video and audio
recordings of his April 28 interview with arson investigators. Appellant challenges
their admissibility under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966),
arguing that the interrogation was custodial and he had not been properly advised
of his rights before making the statements. Appellant asks for reversal and a new
trial.

Standard of Review

 We review the trial court's ruling on a motion to suppress for abuse of
discretion. State v. Dixon, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006); State v.
Garrett, 177 S.W.3d 652, 655 (Tex. App.--Houston [1st Dist.] 2005, pet. ref'd). A
trial court abuses its discretion by not suppressing illegally obtained evidence,
which is rendered inadmissible by article 38 of the Code of Criminal Procedure.
Garrett, 177 S.W.3d at 655; see Tex. Code Crim. Proc. Ann. § 38.23 (Vernon
2006). We view the record in the light most favorable to the trial court's ruling,
and we will reverse the trial court's determination only if it is "outside the zone of
reasonable disagreement." Dixon, 206 S.W.3d at 590; Powell v. State, No. 01-05-00638-CR, 2007 WL 846646, at *2 (Tex. App.--Houston [1st Dist.] March 15,
2007, pet. ref'd). We will sustain the lower court's ruling if it is reasonably
supported by the record and is correct on any theory of law applicable to the case.
Dixon, 206 S.W.3d at 590. We defer almost totally to a trial court's express or
implied determination of historical facts, but we review de novo the court's
application of the law of search and seizure to those facts. Id.; Powell, 2007 WL
846646, at *2.

Appellant's Statement

 The record undisputably shows that appellant did not receive his Miranda
warnings until after he had written his statement. After talking at some length with
investigators, appellant wrote the statement which appears on the second page of
State's Exhibit 56, in which he admitted asking Fontenette to burn the store. Only
after he had finished writing did Investigator Deutsch read him the preprinted
Miranda warnings on page 1. After receiving and initialing the warnings,
appellant signed the statement on page 3. (5)

 If this were a custodial interrogation, a statement taken in this manner would
be inadmissible under Miranda. A defendant must be warned "at the outset" of
interrogation, before making any statement. Miranda, 384 U.S. at 467-68, 86 S.
Ct. at 1624; Jones v. State, 119 S.W.3d 766, 775-76 (Tex. Crim. App. 2003). 
Although a written statement is not legally effective or admissible until the
defendant signs it, warnings given after the statement is written, but before it is
signed, will not satisfy Miranda. Jones, 119 S.W.3d at 775-76. However, the
warning requirements do not apply to statements made in a noncustodial setting. 
See Miranda, 384 U.S. at 478, 86 S. Ct. at 1630; Powell, 2007 WL 846646, at *3;
Tex. Code Crim. Proc. Ann. § 38.22 sec. 5 (Vernon 2006). Therefore, the
admissibility of appellant's statements will depend on whether his interrogation
was noncustodial.

Was the Interview Custodial?

 Miranda requirements apply to statements given when a suspect is in
custody. Miranda, 384 U.S. at 444, 86 S. Ct. at 1612. A person is in "custody"
only if, under the circumstances, a reasonable person would believe that his
freedom of movement was restrained to the degree associated with a formal arrest.
Dowthitt v. State, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) (citing Stansbury
v. California, 511 U.S. 318, 322-25, 114 S. Ct. 1526, 1528-30 (1994)). The
"reasonable person" standard presupposes an innocent person. Dowthitt, 931
S.W.2d at 254 (citing Florida v. Bostick, 501 U.S. 429, 438, 111 S. Ct. 2382, 2388
(1991)). 

 The determination of custody is entirely objective, and the subjective intent
of law-enforcement officials is not relevant unless communicated through their
words or actions to the suspect. Dowthitt, 931 S.W.2d at 254. The subjective belief
of the suspect is also not relevant. Id; Powell, 2007 WL 846646, at *3. Station-house questioning, as occurred here, does not in and of itself constitute custodial
interrogation. Dowthitt, 931 S.W.2d at 255. Simply being the focus of a criminal
investigation does not amount to being in custody. Martinez v. State, 131 S.W.3d
22, 32 (Tex. App.--San Antonio 2003, no pet.). When a person voluntarily
accompanies police officers to an interview, and he knows or should know that the
police officers suspect he may be implicated in the crime under investigation, he is
not "restrained of his freedom of movement" and is not in custody. Shiflet v. State,
732 S.W.2d 622, 630 (Tex. Crim. App. 1985).

 However, an interview that begins as noncustodial may escalate into a
custodial interrogation because of police conduct during the encounter. Dowthitt,
931 S.W.2d at 255. In Dowthitt, the Court of Criminal Appeals outlined four
situations in which custody might arise: (1) when the suspect is physically
deprived of his freedom of action in any significant way, (2) when a law
enforcement officer tells a suspect that he cannot leave, (3) when law enforcement
officers create a situation that would lead a reasonable person to believe that his
freedom of movement has been significantly restricted, and (4) when there is
probable cause to arrest, and law enforcement officers do not tell the suspect that
he is free to leave. Id; Shiflet, 732 S.W.2d at 629.

 Appellant likens this case to the fourth situation outlined in Dowthitt,
arguing that because appellant made "statements inconsistent with his innocence"
within the first eight minutes of the interview, this created probable cause, and the
investigators should have read him his rights before proceeding further. Though
appellant's oral admission that he had asked Fontenette to set the fire certainly
would have given the investigators probable cause to arrest him, Dowthitt makes
clear that probable cause is merely a "factor" and does not automatically establish
custody by itself. 931 S.W.2d at 255. Rather, custody is established if the
manifestation of probable cause, combined with other circumstances, would lead a
reasonable person to believe that he is under restraint to the degree associated with
arrest. Id. (emphasis added); see Garcia v. State, 106 S.W.3d 854, 858-59 (Tex.
App.--Houston [1st Dist.] 2003, pet. ref'd).

 In Dowthitt, among the circumstances that contributed to establishing custody
were that the suspect had been at the police station for fifteen hours before making
his statement, that his repeated requests to see his wife were refused, and that police
officers insisted on accompanying him when he went to the restroom. 931 S.W.2d
at 256. In Resendez v. State, No. 14-05-00098-CR, 2006 WL 3407829, at *7-8
(Tex. App.--Houston [14th Dist.], Nov. 28, 2006, no pet. filed), an interrogation
became custodial after a murder suspect failed a polygraph test and then admitted
that he had shot the victim; at no time during the interrogation did the officers tell
him he was free to leave, and they arrested him immediately after he made the
statement. In Ruth v. State, 645 S.W.2d 432, 434 (Tex. Crim. App. 1979), a case
cited by appellant, the interrogating officer testified that he "would have detained"
the suspect if he had tried to leave without making a statement. Cf. Meek v. State,
790 S.W.2d 618, 622 (Tex. Crim. App. 1990)(distinguishing Ruth on that basis
from noncustodial situation in which suspect remained "free to leave").

 The facts in this case, by contrast, more closely resemble other instances in
which interrogations were found to be noncustodial. According to Dowthitt,
probable cause can make an interrogation custodial if officers do not tell the suspect
he is free to leave. 931 S.W.2d at 255. But if officers explicitly assure the suspect
that he is not under arrest and is free to leave, or if he does in fact finish the
interview and leaves without being arrested, courts are likely to find the interview
noncustodial even with probable cause. See Meek, 790 S.W.2d at 620-21; Garcia,
106 S.W.3d at 858-59 (appellant came in voluntarily; officer told him he was free
to leave; a reasonable person in appellant's position would not have believed he was
restrained to the degree associated with a formal arrest).

 The record shows that throughout the interview, both before and after
appellant wrote his statement, the arson investigators repeatedly assured him that he
was not under arrest and that he was free to leave at any time. (6) At the conclusion of
the interview, appellant went home with his wife. He was not arrested, and was not
formally charged until several days later. The circumstances here are identical to
those of an interview the United States Supreme Court held to be noncustodial in
Oregon v. Mathiason, 429 U.S. 492, 493-95, 97 S. Ct. 711, 713-14 (1977), in
which the suspect came to police offices voluntarily, was told he was not under
arrest, gave an incriminating confession before being Mirandized, and was allowed
to leave unmolested after being told the case would be referred to the district
attorney for action. See also Meek, 790 S.W.2d at 622 (holding interview
noncustodial under similar circumstances).

 Other factors, though not dispositive by themselves, may combine to
determine whether an interview took place in a custodial setting. In Dowthitt, the
marathon length of the interrogation was crucial in establishing custody. 931
S.W.2d at 256. Here, by contrast, appellant was talking freely within minutes and
began writing his statement no more than an hour and a half into the interview.
Appellant complains that he felt constrained because he was "not allowed to talk
with his wife in a meaningful manner." But, the videotape shows that appellant's
wife wandered freely in and out of the room while appellant was writing his
statement and during his conversation with investigators afterward, and that
appellant and his wife conversed privately and at length on several occasions when
investigators left them alone in the room. (7) Cf. Garcia, 106 S.W.3d at 859 (after
making statement, suspect was taken back to visitor's room and left unguarded with
his girlfriend). The videotape also shows that throughout the interview the door to
the hallway remained open, and that the two investigators were in plain clothes and
never displayed guns or handcuffs in a threatening manner. Cf. Garcia, 106 S.W.3d
at 858 (there were only two officers in the room and neither was armed); Trejos v.
State, No. 01-05-00646-CR, 2007 WL 1500276, at *10 (Tex. App--Houston [1st
Dist.], May 24, 2007, no pet. filed) (appellant was interviewed by one officer in
plain clothes, and in "office-like setting").

 In sum, the record supports the trial court's finding that appellant was not in
custody when he made his statements. Although appellant claims not to remember
being told he was free to leave, his denial is clearly contradicted by the videotape
and by the testimony of Deutsch and Blevins. The trial court, as the sole finder of
fact and judge of the credibility of witnesses in a suppression hearing, was entitled
to disbelieve appellant. See State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App.
2000); Garrett, 177 S.W.3d at 655. Cf. Meek, 790 S.W.2d at 620 (trial court was
entitled to disbelieve appellant's claim that he had been placed in handcuffs and
threatened, when investigators testified that he was free to leave and had made his
statement voluntarily); Colgin v. State, 132 S.W.3d 526, 530 (Tex. App.--Houston
[1st Dist.] 2004, pet. ref'd) (trial court's finding that confession was voluntary was
supported by record, despite appellant's claim of coercion). 

 Because the trial court did not abuse its discretion in finding that the
interrogation was noncustodial, we overrule appellant's fifth point of error.

Ineffective Assistance of Counsel

 In his sixth point of error, appellant claims he suffered from ineffective
assistance of counsel, because his trial counsel failed to object to irrelevant and
prejudicial "victim impact" evidence offered during the guilt phase of the trial.
Specifically, appellant complains that his counsel did not object when Tom
Coleman testified to the importance of the building to his family and to his future
financial security, and to the emotional impact the loss had on him.

 To prevail on a claim of ineffective assistance of counsel, the appellant must
meet the standard set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S.
Ct. 2052, 2064 (1984). First, he must demonstrate that his counsel's representation
fell below an objective standard of reasonableness under prevailing professional
norms. Id. at 688, 104 S. Ct. at 2064-65; Mitchell v. State, 68 S.W.3d 640, 642
(Tex. Crim. App. 2002); Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App.
1999). Second, the appellant must establish that his counsel's performance was so
deficient that it prejudiced his defense. Howland v. State, 966 S.W.2d 98, 104 (Tex.
App.--Houston [1st Dist.] 1998), aff'd on other grounds, 990 S.W.2d 274 (Tex.
Crim. App. 1999). Thus, the appellant must show a reasonable probability that, but
for his counsel's unprofessional errors, the result of the proceeding would have
been different. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068; Howland, 966
S.W.2d at 104. The appellant has the burden to establish both these prongs by a
preponderance of the evidence. Jackson v. State, 973 S.W.2d 954, 956 (Tex. Crim.
App. 1998). Because there is a strong presumption that trial counsel's conduct fell
within the wide range of reasonable professional assistance, appellant must
overcome the presumption that, under the circumstances, counsel's action or
inaction might be considered "sound trial strategy." Strickland, 466 U.S. at 689,
104 S. Ct. at 2065; Gamble v. State, 916 S.W.2d 92, 93 (Tex. App.--Houston [1st
Dist.] 1996, no pet.). Any allegation of ineffectiveness must be firmly founded in
the record, which must demonstrate affirmatively the alleged ineffectiveness.
Thompson, 9 S.W.3d at 813. We will not speculate to find trial counsel ineffective
when the record is silent on counsel's reasoning or strategy. Gamble, 916 S.W.2d at
93.

 The record contains no evidence as to counsel's reason for failing to object,
and appellant thus fails to rebut the presumption that counsel acted reasonably. See
Thompson, 9 S.W.3d at 814. The decision not to object to inadmissible evidence
can sometimes be justified as part of a sound trial strategy. Darby v. State, 922
S.W.2d 614, 623-24 (Tex. App.--Fort Worth 1996, pet. ref'd). Generally, an
isolated failure to object to certain procedural mistakes or improper evidence does
not constitute ineffective assistance of counsel. Ingham v. State, 679 S.W.2d 503,
509 (Tex. Crim. App. 1984); Cloud v. State, Nos. 01-05-00817-CR and 01-05-00818-CR, 2007 WL 1228630, at *6 (Tex. App.--Houston [1st Dist.], April 26,
2007, no pet.). Appellant has not shown his counsel's performance was deficient,
and he fails to satisfy the first prong of Strickland. See Strickland, 466 U.S. at 688,
104 S. Ct. at 2064.

 Even assuming this evidence was improperly admitted, it is unlikely that the
error caused significant harm to appellant. Given the overwhelming weight of the
evidence supporting appellant's guilt, it is unlikely that the jury would have
returned a different verdict during the guilt phase of the trial had these few portions
of Coleman's testimony been excluded. Appellant has not shown that trial
counsel's failure to object was sufficiently prejudicial to affect the outcome of the
proceeding, and he fails to satisfy the second prong of Strickland. See Strickland,
466 U.S. at 694, 104 S. Ct. at 2068.

 We overrule appellant's sixth point of error.

CONCLUSION


 We affirm the judgment of the trial court.






 Sherry Radack


 Chief Justice


Panel consists of Chief Justice Radack and Justices Alcala and Bland.


Do not publish. See Tex. R. App. P. 47.2(b).


1. Appellant does not challenge the legal or factual sufficiency of the arson conviction.
2. Act of May 25, 1995, 74th Leg., R.S., ch. 621, § 1, 1995 Tex. Gen. Laws 3483, 3483-84
(amended 2003) (current version at Tex. Pen. Code Ann. § 35.02(a)(2)(Vernon 2006)). The
offense was committed before Sept. 1, 2005, the effective date of the most recent
amendment. The equivalent section of § 35.02 now reads:


 (a) A person commits an offense if, with intent to defraud or deceive an insurer, the
person, in support of a claim for payment under an insurance policy:

 (2) presents or causes to be presented to an insurer a statement that the person knows
contains false or misleading material information. 
3. Appellant's assertion that his false statement to Frankum was not a "communication. . .
evidencing a loss, injury, or expense" as then defined in former § 35.01(5), Act of May 25,
1995, 74th Leg., R.S., ch. 621, § 1, 1995 Tex. Gen. Laws 3483, 3483 (amended 2003)
(current version at Tex. Pen. Code Ann. § 35.01(3)(Vernon 2006)), is unpersuasive.
Appellant made his denial in the course of a longer conversation in which he told Frankum
about the nature of his business, estimated its weekly cash flow, described his activities on
the night of the fire, and identified other people who might have been near the store prior to
the fire. This statement, taken as a whole, evidenced appellant's loss. His denial of
knowledge is best characterized not as a "statement" by itself, but rather as "false or
misleading material information... concerning whether property was damaged or lost in the
manner and under the circumstances described" contained within a statement related to his
claim. We note that the current version, § 35.01(3), drops the phrase "evidencing a loss" and
defines "statement" simply as "an oral or written communication or a record or documented
representation of fact made to an insurer."
4. Even if appellant did not actually use the word "claim," the jury was entitled to believe
Regan Latta's testimony that his office would automatically set the claim process into
motion whenever an insured called and reported a loss.
5. This sequence of events is confirmed by the testimony of investigators Deutsch and Blevins. 
On the videotape, appellant can be seen writing the first paragraph of his statement
beginning at 25 minutes and ending at 33 minutes. Over the next fifteen minutes, at the
investigators' prompting he adds details of the tools and a physical description of Fontenette.
At 78 minutes, Deutsch turns to the first page and reads appellant the Miranda warnings.
Appellant initials these and then signs on page 3.
6. The videotape confirms the investigators' testimony, clearly showing them telling appellant
on four occasions that he was not under arrest and was free to leave: at 15 minutes, 64
minutes, 75 minutes and 77 minutes. Each time, appellant can be seen nodding
acknowledgment. Appellant wrote the incriminating paragraph of the statement at between
25 and 33 minutes.
7. Their whispered conversations are completely inaudible on both tapes, and so their privacy
remains intact.