

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-1371-13

### Ex parte RONALD THOMPSON, Appellant

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FOURTH COURT OF APPEALS
### BEXAR COUNTY

**KELLER, P.J., delivered the opinion of the Court in which PRICE, WOMACK, JOHNSON, KEASLER, HERVEY, COCHRAN and ALCALA, JJ., joined. MEYERS, J., dissented.**

The "improper photography or visual recording" statute makes it a crime to, among other things, photograph or record by electronic means a visual image of another person under certain circumstances.[1]  Subsection (b)(1) of the statute makes such acts a crime if: (1) the person being photographed or recorded is not in a bathroom or private dressing room, (2) the photograph or recording of the person is made without that person's consent, and (3) the photograph or recording is made with the intent to arouse or gratify the sexual desire of any person.[2]  We hold that, to the

---

[1] TEX. PENAL CODE § 21.15.

[2] *Id.* § 21.15(b)(1).

extent that it proscribes taking photographs and recording visual images, Subsection (b)(1) of the statute is facially unconstitutional in violation of the freedom of speech guarantee of the First Amendment.[3]  Consequently, we affirm the judgment of the Court of Appeals.

## I. BACKGROUND

### A. The Charges

Appellant stands charged with twenty-six counts of improper photography or visual recording under Texas Penal Code § 21.15(b)(1).  Each count of the indictment alleges that appellant, "with intent to arouse or gratify the sexual desire of THE DEFENDANT, did by electronic means record another . . . at a location that was not a bathroom or private dressing room."  Each count further specifies the name of an ".avi" file that was recorded.  Some of the counts contain additional information regarding the subject matter and location of the recording.  For instance, several counts describe "unknown female[s]" with various colors of bathing suits or bikinis "in" or "at" "a water park."[4]

Appellant filed a pretrial application for a writ of habeas corpus, in which he alleged that the statute on which his prosecution was based is facially unconstitutional in violation of the First Amendment.[5]  The trial court denied the application, and appellant appealed.

### B. Appeal

The Fourth Court of Appeals held that § 21.15(b)(1) is void on its face in violation of the

---

[3]  We do not address the constitutionality of the part of § 21.15(b)(1) that proscribes the broadcast or transmission of visual images.  *See id.* § 21.15(b)(1).

[4]  Counts five, seventeen, eighteen, and nineteen.

[5]  He also alleged that the statute violated Article I, § 8, of the Texas Constitution.

First Amendment.[6] The appellate court analyzed the issue in three parts: (1) whether the First Amendment was implicated by the statute, (2) whether the statute was content based or content neutral, and (3) whether the statute satisfied intermediate scrutiny.[7] First, the court concluded that the First Amendment was implicated because "the statute not only restricts an individual's right to photograph, a form of speech protected by the First Amendment, . . . but the statute also restricts a person's thoughts, which the U.S. Supreme Court has held is 'wholly inconsistent with the philosophy of the First Amendment.'"[8] Second, the court concluded that the statute was content neutral because it "does not favor one type of photograph over another."[9] Finally, the court concluded that the intermediate-scrutiny standard was not satisfied because the statute reached "a substantial amount of constitutionally protected conduct."[10] As a consequence of its holding, the court of appeals reversed the judgment of the trial court and remanded the case for entry of an order dismissing the prosecution.[11]

## C. Discretionary Review

### 1. *State's Arguments*

On discretionary review, the State contends that the First Amendment is not even implicated by the statute because the act of photography is conduct and is not inherently expressive. According

---

[6] *Ex parte Thompson*, 414 S.W.3d 872, 881 (Tex. App.–San Antonio 2013, pet. granted).

[7] *Id.* at 876-81.

[8] *Id.* at 876-78.

[9] *Id.* at 878.

[10] *Id.* at 878-81.

[11] *Id.* at 881.

to the State's brief, "Photography is essentially nothing more than making a chemical or electronic record of an arrangement of refracted electromagnetic radiation (light) at a given period of time." At oral argument, the State also contended that the act of pushing the button on the camera to take a picture was not necessarily communicative. Rather, relying upon *Texas v. Johnson*,[12] the State contends that taking a picture may become communicative, if there is an intent to convey a particularized message, but that such an inquiry can be conducted only in the context of an "as applied" challenge with a developed record.

Relying in part upon our prior decision in *Scott v. State*,[13] the State also contends that the improper-photography statute does not implicate the First Amendment because the elements of specific intent and lack of consent limit the scope of the regulated conduct to that which invades the privacy of another in an essentially intolerable manner. The State argues that the specific-intent requirement negates any First Amendment implications because the statute "regulates a person's intent in creating a visual record and not the contents of the record itself."[14] The State further contends that the lack-of-consent requirement means that the statute does not apply to a photograph of a person in public as long as the photograph is of an area of that person that was exposed to the public. The State argues that any person who appears in public and exposes a certain part of the body to the public has necessarily consented to that part being photographed, and therefore, the improper-photography statute would not apply. But, the State reasons, if the person is not in public,

[12] 491 U.S. 397 (1989).

[13] 322 S.W.3d 662 (Tex. Crim. App. 2010).

[14] Quoting *Ex parte Nyabwa*, 366 S.W.3d 719, 726 (Tex. App.–Houston [14th Dist.] 2011, pet. ref'd).

or the photograph is of an area of the person that is not exposed to the public—such as the use of an X-Ray camera that can see through clothing or a photograph taken up a woman's skirt—then the improper-photography statute would criminalize such behavior if done with the requisite intent. This construction of the term "consent," the State argues, would negate any First Amendment implications of the statute.

In the alternative, the State argues that, even if the First Amendment is implicated, the improper-photography statute constitutes a reasonable content-neutral restriction that serves legitimate and important government interests. The State argues that the statute is content neutral because it "does not limit the substantive content of visual recordings nor favor one type of photograph over another." The State further argues that the statute serves the important government interest of protecting privacy by "protecting individuals from invasive covert photography" and "protecting individuals from having their images unconsensually exploited for the sexual gratifications of others."

Further, the State argues that a statute may not be struck down on overbreadth grounds merely because it may apply to *some* protected speech. Rather, the State contends, a statute must apply to a substantial amount of protected conduct before it may be invalidated, and the State contends that the limiting elements of specific intent and non-consent prevent the improper-photography statute from reaching a substantial amount of protected conduct.

### 2. *Arguments of Appellant and the Amicus*

Appellant argues that photography is expressive. He contends that the recording of an image is expressive because it is always done to capture an event that the recorder thought was important. He further contends that the State's characterization of taking a photograph as conduct is overly

simplistic and would apply to publishing a newspaper or painting a masterpiece. Relying upon *Kaplan v. California*,[15] appellant contends that the First Amendment protects more than mere speech, protecting also pictures, films, paintings, drawings, and engravings. He also contends that the improper-photography statute prohibits not merely the act of photography but photography with intent to arouse or gratify sexual desire, and the latter is expressive.

Appellant further contends that the improper-photography statute impermissibly penalizes not only the expressive act of photography but also the right to receive the public expressions of others. He contends that the State's interpretation of the statute would "punish those who receive such information with their mind in the proverbial gutter" and argues that "such a stance is undoubtedly the stuff of Orwellian 'thought-crime' rather than the reasonable advancement of an important governmental interest."

Appellant also contends that the *Scott* case relied upon by the State is distinguishable because the improper-photography statute applies even to photographs taken in public, where no privacy interest is present. Assuming *arguendo* that the statute is content neutral, appellant contends that it does not satisfy intermediate scrutiny because it applies even when privacy interests are not implicated. While the legislature may have a legitimate interest in prohibiting "peeping tom" and "up-skirt" photography, appellant contends that the language of the statute "utterly fails to achieve that interest because it fails to distinguish those situations from merely photographing a girl in a skirt walking down the street." Appellant argues that the "street photographer, the entertainment reporter, patrons of the arts, attendees to a parade or a pep-rally, [and] even the harmless eccentric are all at risk of incarceration under a plain reading of this statute."

---

[15] 413 U.S. 115 (1973).

The *amicus curiae*[16] makes a number of arguments in favor of its view that the part of the statute at issue here is unconstitutional, but of particular interest is its contention that the statute is actually a content-based restriction on expression. The amicus argues that the statute discriminates based on content because it singles out images of "another," which is defined elsewhere as a person, as opposed to "an animal, a landscape, or a building." The amicus also states that the statute "covers only those photographs that have the intended primary effect of causing sexual arousal, and it is the content of speech that would cause such arousal." According to the amicus, then, the proper standard of review is strict scrutiny (rather than intermediate scrutiny), and the amicus contends that the statutory provision at issue fails to satisfy that standard.

At oral argument, the amicus[17] suggested that the State's broad interpretation of the term "consent" might be a sufficient narrowing construction of the statute to avoid a First Amendment violation. If the improper-photography statute applied only when privacy interests were truly involved, such as the "peeping tom" and "up-skirt" scenarios, then the amicus would agree that the statute would not violate the First Amendment. The amicus said that saving the statute in this manner would be possible only if this Court were to agree to construe the term "consent" in the manner that the State suggests.

## II. ANALYSIS

### A. The Statute and Appellant's Challenge

The "Improper Photography and Visual Recording" statute at issue provides, in relevant part:

---

[16] The amicus brief was submitted by The Reporters Committee for Freedom of the Press.

[17] Appellant's counsel agreed to share his oral argument time with the amicus, represented by Eugene Volokh.

A person commits an offense if the person:

(1) photographs or by videotape or other electronic means records . . . a visual image of another at a location that is not a bathroom or private dressing room:

(A) without the other person's consent; and

(B) with intent to arouse or gratify the sexual desire of any person.[18]

A facial challenge to the constitutionality of a statute that defines the offense charged may be raised by means of a pre-trial application for a writ of habeas corpus.[19]

## B. Is the First Amendment Implicated?

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."[20] The First Amendment right to freedom of speech applies to the states by virtue of the Fourteenth Amendment.[21] We must first determine whether that right to freedom of speech is implicated in this case.

### 1. *The Expressive Nature of Photographs and Visual Recordings*

The State relies heavily upon the test for determining whether conduct that is not inherently expressive "possesses sufficient communicative elements to bring the First Amendment into play."[22] Under that test, conduct implicates the First Amendment if (1) there was an intent to convey a particularized message, and (2) the likelihood was great that the message would be understood by

---

[18] TEX. PENAL CODE § 21.15(b)(1).

[19] *Ex parte Ellis*, 309 S.W.3d 71, 79 (Tex. Crim. App. 2010).

[20] U.S. CONST., Amend. 1.

[21] *Board of Educ. v. Barnette*, 319 U.S. 624, 638-39 (1943).

[22] *Johnson*, 491 U.S. at 404.

those who viewed it.[23]   This test was applied to flag burning in *Texas v. Johnson* because that conduct is not inherently expressive.[24]   But some conduct is inherently expressive, and when that is the case, the particularized-message test does not apply.[25]   In *Hurley*, the Supreme Court found that parades are inherently expressive and that there is no need to isolate a particularized message being sent by the marchers.[26]   The Court remarked that, if a particularized message were always a necessary condition for invoking the First Amendment, then constitutional protection "would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll."[27]

The painting example is telling, because photographs are much like paintings for communicative purposes, at least when a person is consciously involved in making the photograph.[28] In *Kaplan v. California*, the Supreme Court explained that it "has applied similarly conceived First Amendment standards to moving pictures, to photographs, and to words in books."[29]   The Supreme

---

[23]   *Id.*

[24]   *Id.* at 405 ("We have not automatically concluded, however, that any action taken with respect to our flag is expressive. Instead, in characterizing such action for First Amendment purposes, we have considered the context in which it occurred." ).

[25]   *Hurley v. Irish-American Gay, Lesbian and Bisexual Group*, 515 U.S. 557, 569 (1995).

[26]   *Id.* at 569-70 ("Not many marches, then, are beyond the realm of expressive parades . . . . [A] private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech.").

[27]   *Id.* at 569.

[28]   In oral argument, the amicus suggested that robotic cameras, which record pictures or videos automatically, may be outside First Amendment protection.  We exclude these types of cameras from our analysis.

[29]   413 U.S. at 119.

Court further mentioned "pictures, films, paintings, drawings, and engravings" in the same breath as the "oral utterance and the printed word" in describing the protection conferred by the First Amendment.[30] Even in the context of obscenity and child pornography, the Supreme Court has not questioned the expressive nature of visual images, saying that laws directed at the dissemination of child pornography "run the risk of suppressing protected expression."[31] The Court has referred to books and films as "traditional forms of expression,"[32] and to the transmission of cable television programming as "speech alone."[33] The Supreme Court has also addressed the First Amendment implications of photographs and visual recordings in the depicting of "virtual child pornography,"[34] animal cruelty,[35] and money.[36]

Relying in part upon *Hurley* and *Kaplan*, a number of lower courts have held that the First

---

[30] *Id.* at 119-20 ("As with pictures, films, paintings, drawings, and engravings, both oral utterance and the printed word have First Amendment protection until they collide with the long-settled position of this Court that obscenity is not protected by the Constitution.").

[31] *New York v. Ferber*, 458 U.S. 747, 756 (1982).

[32] *Id.* at 771.

[33] *United States v. Playboy Entertainment Group*, 529 U.S. 803, 813-14 (2000).

[34] *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002). Virtual child pornography consists of "sexually explicit images that appear to depict minors but were produced without using any real children." *Id.* at 239.

[35] *United States v. Stevens*, 559 U.S. 460, 468 (2010).

[36] *Regan v. Time*, 468 U.S. 641, 648-49 (1984).

Amendment fully protects visual art,[37] and photographs and video recordings in particular,[38] and that

the particularized-message test does not apply in those contexts.[39] The Tenth Circuit has recognized

some conflict among the federal circuits regarding the outer boundaries of purely expressive works,[40]

and the Second Circuit may have retreated from its earlier expansive view of those boundaries,

though the Second Circuit still takes the position that certain items—such as photographs—are

always sufficiently expressive to trigger First Amendment review.[41]

The Fifth Circuit has noted that, in *Hurley*, the Supreme Court referred solely to great works

of art and had not elaborated on the extent of First Amendment protection for visual non-speech

objects or artworks.[42] The object in question in *Kleinman* was a junked car, and the Fifth Circuit

found any expressive component of that object to be "at best secondary."[43] We agree with the Fifth

---

[37] *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060-61 (9th Cir. 2010) (tattoos); *White v. City of Sparks*, 500 F.3d 953, 955-56 (9th Cir. 2007) (painting); *Comedy III Productions v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 398-99, 21 P.3d 797, 804 (2001).

[38] *Bery v. City of New York*, 97 F.3d 689, 696 (2d Cir. 1996) ("[P]aintings, photographs, prints and sculptures . . . always communicate some idea or concept to those who view it, and as such are entitled to full First Amendment protection."); *ETW Corp. v. Jireh Publishing*, 332 F.3d 915, 924 (6th Cir. 2003) ("The protection of the First Amendment is not limited to written or spoken words, but includes other mediums of expression, including music, pictures, films, photographs, paintings, drawings, engravings, prints, and sculptures.") (citing, *inter alia*, *Hurley*, *Kaplan*, and *Bery*); *White*, 500 F.3d at 956 (agreeing with *ETW* and *Bery*); *Board of Trustees v. New Life Art*, 683 F.3d 1266, 1276 (11th Cir. 2012) (citing, *inter alia*, *Hurley*, *Kaplan*, *ETW Corp.*); *Louis Feraud Int'l S.A.R.L. v. Viewfinder*, 406 F. Supp. 2d 274, 283 (S.D.N.Y. 2005), *vacated on other grounds*, 489 F.3d 474 (2d Cir. 2007).

[39] *See* previous two footnotes.

[40] *Cressman v. Thompson*, 719 F.3d 1139, 1153 n.14 (10th Cir. 2013).

[41] *Mastrovincenzo v. City of New York*, 435 F.3d 78, 84-85, 93 (2d Cir. 2006).

[42] *Kleinman v. City of San Marcos*, 597 F.3d 323, 326-27 (5th Cir. 2010).

[43] *Id.* at 327-28.

Circuit's conclusion that *Hurley* is not applicable to a junked car because it is not inherently expressive. However, to the extent that *Kleinman* might be read as saying that *Hurley*'s statement about paintings applies only to great works of art, such a view would appear to be at odds with language from later Supreme Court cases that suggest that even valueless works are constitutionally protected:

> Crudely violent video games, tawdry TV shows, and cheap novels and magazines are no less forms of speech than The Divine Comedy, and restrictions upon them must survive strict scrutiny . . . . Even if we can see in them nothing of any possible value to society, they are as much entitled to the protection of free speech as the best of literature.[44]

> *Most* of what we say to one another lacks "religious, political, scientific, educational, journalistic, historical, or artistic value" (let alone serious value), but it is still sheltered from Government regulation. Even "[w]holly neutral futilities . . . come under the protection of free speech as fully as do Keats' poems or Donne's sermons."[45]

The inherently expressive nature of pictures is reflected by the fact that phrases like "a picture is worth a thousand words" and "every picture tells a story" are considered cliches. We conclude that photographs and visual recordings are inherently expressive, so there is no need to conduct a case-specific inquiry into whether these forms of expression convey a particularized message.

### 2. *The Expressive Nature of Creating Photographs and Visual Recordings*

If photographs and visual recordings are inherently expressive, what about the act of creating photographs and visual recordings? If the end product is inherently expressive, can the act that creates the end product be mere conduct that is expressive only if it meets the particularized-message test?

---

[44] *Brown v. Entertainment Merchants Ass'n.*, 131 S. Ct. 2729, 2737 n.4 (2011).

[45] *Stevens*, 559 U.S. at 479-80 (emphasis, brackets, and ellipsis in *Stevens*).

In addressing the constitutionality of restrictions on video games, the Supreme Court concluded that it makes no difference in the First Amendment analysis whether government regulation applies to "creating, distributing, or consuming" speech.[46] The Seventh Circuit and the Supreme Court of Illinois have held that making an audio-visual recording "is necessarily included with the First Amendment's guarantee . . . as a corollary of the right to disseminate the resulting recording."[47] The Ninth Circuit has held that the process of creating a tattoo is as much speech as the tattoo itself.[48] And several courts have held that the First Amendment includes the right of citizens to photograph or video record the conduct of police officers.[49]

In support of its holding, the Seventh Circuit concluded that laws "enacted to control or suppress speech may operate at different points in the speech process"[50] and that there is "no fixed First Amendment line between the act of creating speech and the speech itself."[51] The Ninth Circuit explained why it makes no sense to draw a First Amendment line between an inherently expressive end product and the creation of that end product:

---

[46] *Entertainment Merchants Ass'n.*, 131 S. Ct. at 2734 n.1.

[47] *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012); *People v. Clark*, 6 N.E.3d 154, 159-60 (Ill. 2014).

[48] *Anderson*, 621 F.3d at 1061.

[49] *Glik v. Cunniffe*, 655 F.3d 78, 82-84 (1st Cir. 2011); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000). Although some conflict exists over whether this right is clearly established for qualified immunity purposes, "The First Circuit's decision in *Glik* aligns with authority from the Eleventh Circuit and with the weight of district-court decisions." *ACLU of Illinois*, 679 F.3d at 601 n.10.

[50] *ACLU of Illinois*, 679 F.3d at 596 (quoting *Citizens United v. FEC*, 558 U.S. 310, 336 (2010)).

[51] *Id.*

[N]either the Supreme Court nor our court has ever drawn a distinction between the process of creating a form of *pure* speech (such as writing or painting) and the product of these processes (the essay or the artwork) in terms of the First Amendment protection afforded. Although writing and painting can be reduced to their constituent acts, and thus described as conduct, we have not attempted to disconnect the end product from the act of creation. Thus, we have not drawn a hard line between the essays John Peter Zenger published and the act of setting the type. The process of expression through a medium has never been thought so distinct from the expression itself that we could disaggregate Picasso from his brushes and canvas, or that we could value Beethoven without the benefit of strings and woodwinds. In other words, we have never seriously questioned that the processes of writing words down on paper, painting a picture, and playing an instrument are purely expressive activities entitled to full First Amendment protection.[52]

The camera is essentially the photographer's pen or paintbrush. Using a camera to create a photograph or video is like applying pen to paper to create a writing or applying brush to canvas to create a painting. In all of these situations, the process of creating the end product cannot reasonably be separated from the end product for First Amendment purposes. This is a situation where the "regulation of a medium inevitably affects communication itself."[53] We conclude that a person's purposeful creation of photographs and visual recordings is entitled to the same First Amendment protection as the photographs and visual recordings themselves.

### 3. *Intent*

We next address the State's argument that the intent element of the statute places the otherwise expressive activity of photography and visual recording outside the protection of the First Amendment. We have recognized that the mere existence of an intent element does not by itself

---

[52] *Anderson*, 621 F.3d at 1061 at 1061-62 (citation omitted, emphasis in original); *see also ACLU of Illinois*, 679 F.3d at 595 (audio-video recording) (quoting *Anderson*); *Coleman v. City of Mesa*, 230 Ariz. 352, 359, 284 P.3d 863, 870 (2012) (discussing *Anderson*).

[53] *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994) (signs).

eliminate First Amendment concerns posed by a statute;[54] it is the specific type of intent that matters.[55]  In *Texas v. Johnson*, for example, the flag-burning statute contained an intent element, but, if anything, the intent element exacerbated the First Amendment concerns.[56]

When the intent is to do something that, if accomplished, would be unlawful and outside First Amendment protection, such as the intent to threaten or intimidate, such an intent might help to eliminate First Amendment concerns.[57]  But when the intent is something that, if accomplished, would constitute protected expression, such an intent cannot remove from the ambit of the First Amendment conduct that is otherwise protected expression.[58]  The Supreme Court and this Court have both explained that the First Amendment protects freedom of thought.[59]  In *Ex parte Lo*, we explained that the First Amendment is implicated by  "constitutionally protected speech when that speech is coupled with constitutionally protected thought."[60]  The intent at issue in *Lo*—the intent

---

[54]  *Long v. State*, 931 S.W.2d 285, 290 n.4 (Tex. Crim. App. 1996)

[55]  *Id.* at 293.

[56]  *See Johnson*, 491 U.S. at 411 ("The Texas law is thus not aimed at protecting the physical integrity of the flag in all circumstances, but is designed instead to protect it only against impairments that would cause serious offense to others.  Texas concedes as much: 'Section 42.09(b) reaches only those severe acts of physical abuse of the flag carried out in a way likely to be offensive. The statute mandates intentional or knowing abuse, that is, the kind of mistreatment that is not innocent, but rather is intentionally designed to seriously offend other individuals.'").

[57]  *See Virginia v. Black*, 538 U.S. 343, 359-63 (2003).

[58]   *See Ex parte Lo*, 424 S.W.3d 10, 25 n.71 (Tex. Crim. App. 2013) (quoting *Ex parte Nyabwa*, 366 S.W.3d 710, 711-12 (Tex. Crim. App. 2012) (Keller, P.J., dissenting to refusal of defendant's PDR) ("It is not enough to say that the statute is directed only at intent, if the intent consists of thought that is protected by the First Amendment.")).

[59]  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *Lo*, 424 S.W.3d at 25.

[60]  *Lo*, 424 S.W.3d at 26.

to arouse or gratify sexual desire—is the exact same intent at issue in the present case.[61]  The State

in *Lo* made the same argument that the State makes here, and we rejected it.[62]   As the Supreme

Court has explained, "Sexual expression which is indecent but not obscene is protected by the First

Amendment,"[63] and even some obscene sexual expression enjoys First Amendment protection if it

occurs solely within the confines of the home.[64]  Of course, the statute at issue here does not require

that the photographs or visual recordings be obscene, be child pornography, or even be depictions

of nudity, nor does the statute require the intent to produce photographs or visual recordings of that

nature.  Banning otherwise protected expression on the basis that it produces sexual arousal or

gratification is the regulation of protected thought,[65] and such a regulation is outside the

government's power:

---

[61]  *See id.* at 25.  The culpable mental state of "intent to arouse or gratify the sexual desire of any person" is also an element of the crimes of indecent exposure and indecency with a child. TEX. PENAL CODE §§ 21.08, 21.11.  But in those instances, setting aside the culpable mental state, the defendant has committed conduct that is not protected by the First Amendment, and so those statutes do not proscribe constitutionally protected *speech* coupled with constitutionally protected thought. *See Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) (distinguishing a case involving an ordinance that criminalized bias-motivated fighting words from a statute that imposes enhanced punishment for an assault on the basis of bias motivation because the ordinance in the former case was "explicitly directed at expression" while the statute in the latter case was "aimed at conduct unprotected by the First Amendment").

[62]  *Lo*, 424 S.W.3d at 25-26.

[63]  *Sable Communications of California v. FCC*, 492 U.S. 115, 126 (1989); *Reno v. Aclu*, 521 U.S. 844, 874 (1997).  *See also Lo*, 424 S.W.3d at 20, 22.

[64]  *Stanley v. Georgia*, 394 U.S. 557 (1969).  But government may attempt to prevent obscenity from entering the home by penalizing its importation and distribution, *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 376 (1971), and government may ban even personal possession of child pornography because such possession is directed toward the evils of child exploitation and is not merely "a paternalistic interest in regulating the [defendant's] mind." *Osborne v. Ohio*, 495 U.S. 103, 109 (1990).

[65]  *Lo*, 424 S.W.3d at 25-26.

> The government cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts. First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end. The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought."[66]

As we did in *Lo*, we reject the State's argument that the intent element of the statute removes it from the ambit of the First Amendment.[67]

### 4. *Consent*

The State also contends that the statute's requirement that the photography or visual recording occur "without consent" is sufficient to save the statute if the word "consent" is construed broadly enough. The State argues that people who go out in public necessarily consent to some measure of public view and that the boundaries of that consent are dictated by the circumstances.

The federal constitution affords the states broad authority to narrowly construe a statute to avoid a constitutional violation.[68] We have held that Texas courts have a duty to employ a reasonable narrowing construction for that purpose.[69] But this Court and the Supreme Court have both held that a narrowing construction should be employed only if the statute is readily susceptible

---

[66] *Free Speech Coalition*, 535 U.S. at 253 (citation and internal quotation marks omitted); *Lo*, 424 S.W.3d at 25.

[67] We need not address the possibility that people who do not have sexual thoughts about the potential subject of a photograph could nevertheless be chilled by this statute. *See FEC v. Wisconsin Right to Life*, 551 U.S. 449, 468 (2007) (Roberts, C.J., joined by Alito, J.) ("No reasonable speaker would choose to [engage in the activity] . . . if its only defense to a criminal prosecution would be that its motives were pure.").

[68] *Osborne*, 495 U.S. at 115 n.12, 119-121.

[69] *Long*, 931 S.W.2d at 295.

to one.[70] We may not rewrite a statute that is not readily subject to a narrowing construction because such a rewriting constitutes a serious invasion of the legislative domain[71] and would sharply diminish the legislature's incentive to draft a narrowly tailored statute in the first place.[72]

We have indicated that a law "is not susceptible to a narrowing construction when its meaning is unambiguous."[73] This statement accords with our longstanding practice of giving effect to the plain meaning of a statute unless the language is ambiguous or the plain meaning leads to absurd results that the legislature could not have possibly intended.[74] It also accords with our more recent statements that a statute is ambiguous if the statutory language "is reasonably susceptible to more than one understanding."[75]

We have held that the meaning of the term "consent" is unambiguous,[76] which would seem to preclude any narrowing construction inconsistent with the term's plain meaning  But even if it were possible to impose a narrowing construction on an unambiguous statute, we conclude that there is no room for a narrowing construction based on the meaning of the term "consent" because that term is already defined in the Penal Code and has been judicially construed in a manner that is

---

[70] *Id.  See also Stevens*, 559 U.S. at 481.

[71] *Long*, 931 S.W.2d at 295; *Stevens*, 559 U.S. at 481.

[72] *Stevens*, 559 U.S. at 481.

[73] *Olvera v. State*, 806 S.W.2d 546, 553 (Tex. Crim. App. 1991).

[74] *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

[75] *Baird v. State*, 398 S.W.3d 220, 229 (Tex. Crim. App. 2013).  *See also Logan v. State*, 89 S.W.3d 619, 628 (Tex. Crim. App. 2002).

[76] *Baird*, 398 S.W.3d at 229-30.

inconsistent with the State's proposed construction. "Consent" is defined as "assent in fact, whether express or apparent."[77] This definition is contained in an introductory definition section of the Texas Penal Code that applies throughout the Code[78] and even to offenses contained in statutes outside the Code unless otherwise excepted.[79] In *Baird v. State*, we construed "consent" under this definition to mean "an actual or real agreement after thoughtful consideration."[80] This definition is inconsistent with the idea that someone consents to a photograph merely because he appears in a public place. The ability to appear in public is one of the amenities of life in this country.[81] People do not ordinarily even think about being photographed when they appear in public. Saying that one should know that there is always a chance of being photographed in public is not the same as saying that one has agreed to it after thoughtful consideration.

Our construction of the term "consent" in *Baird* was not specifically in the context of the

[77] TEX. PENAL CODE § 1.07(a)(11).

[78] *Id.* § 1.07 ("In this code").

[79] *Id.* § 1.03(b).

[80] 398 S.W.3d at 229-30.

[81] *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 164 (1972) (overturning vagrancy ordinance on vagueness grounds: activities involving wandering from place to place "are historically part of the amenities of life as we have known them. They are not mentioned in the Constitution or in the Bill of Rights. These unwritten amenities have been in part responsible for giving our people the feeling of independence and self-confidence, the feeling of creativity. These amenities have dignified the right of dissent and have honored the right to be nonconformists and the right to defy submissiveness. They have encouraged lives of high spirits rather than hushed, suffocating silence."). *See also Byofsky v. Middletown*, 429 U.. 964, 964 (1976) (Marshall, J., dissenting to denial of certiorari) ("The freedom to leave one's house and move about at will is 'of the very essence of a scheme of ordered liberty,' . . . and hence is protected against state intrusions by the Due Process Clause of the Fourteenth Amendment.").

improper-photography statute,[82] but that does not matter: Consent was given a single definition applicable to numerous statutes, including the one at issue here. We cannot arbitrarily carve out a different meaning for that term in the context of the improper-photography statute simply to avoid First Amendment complications.[83]

Moreover, the State's construction of consent is suspect for other reasons. In legal parlance, consent has ordinarily been understood to involve a "concurrence of wills."[84] In the Fourth Amendment context, where issues of consent often arise, consent is generally understood to be a voluntary agreement by a suspect to an intrusion by an officer.[85] The State's construction of consent is at odds with these understandings of the term. Under the State's construction, there need not be any actual concurrence of wills between the photographer and the subject or any actual voluntary agreement by the subject to be photographed. Essentially, the State advocates for a form of constructive consent. The legislature is free to draft a definition of consent along those lines that

---

[82] *See* 398 S.W.3d at 228 (construing "consent" in connection with offense of breach of computer security).

[83] *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 17 (2010) (to propose that the meaning of a term be restricted only when the First Amendment is implicated is "to give the game away").

[84] BLACK'S LAW DICTIONARY 276 (5th ed. 1979).

[85] *See Kaupp v. Texas*, 538 U.S. 626, 631 (2003) (mere submission to a claim of lawful authority is not consent); *Katz v. United States*, 389 U.S. 347, 358 & n.22 (1967) (stating that "the very nature of electronic surveillance precludes its use pursuant to the suspect's consent" and noting that "the usefulness of electronic surveillance depends on lack of notice to the suspect"); *Baldwin v. State*, 278 S.W.3d 367, 372 (Tex. Crim. App. 2009) (answer to question regarding location of identification is not consent to retrieve the identification).

would apply to a particular statute, and has done so in narrow instances,[86] but we are not free to do so by judicial construction.

Furthermore, imposing a judicial construction of a term can be dangerous because that construction can cross over to other areas of the law in which the term is used.[87] Defining "consent" as the State suggests could have any number of unanticipated and unwelcome consequences when applied in other contexts. And a free-floating judicial holding, unanchored by any statutory definition, that a person consents to being photographed or video-recorded merely by appearing in public could lead the government to conclude that it could use cameras to record all of a person's public activities all of the time—surely a questionable proposition.[88]

---

[86] *See* TEX. TRANSP. CODE §§ 522.102 (implied consent of drivers of commercial vehicles to taking of breath, blood, or urine specimen), 724.011 (implied consent of person arrested for offense arising from operation of a motor vehicle to taking of breath or blood specimen), 724.014(a) (unconscious person incapable of withdrawing implied consent under § 724.011). We do not express any opinion regarding the constitutionality of these provisions. *See Missouri v. McNeely*, 133 S. Ct. 1552 (2013).

[87] *See Texas v. Cobb*, 532 U.S. 162, 172-73 (2001) (*Blockburger* test for "same offense" used in Fifth Amendment double-jeopardy context applied to Sixth Amendment right-to-counsel context).

[88] *See United States v. Jones*, 132 S. Ct. 945, 964 (2012) (Alito, J., concurring) (arguing that long term GPS tracking violates reasonable expectations of privacy); *Cramer v. Consol. Freightways*, 209 F.3d 1122, 1135 (9th Cir. 2000) (Fisher, J., dissenting in part) (quoting George Orwell, 1984, 6-7 (Signet Classic 1992) (1949) ("There was . . . no way of knowing whether you were being watched at any given moment. . . . It was even conceivable that they watched everybody all the time. . . . You had to live—did live, from habit that became instinct—in the assumption that every sound you made was overheard, and, except in darkness, every movement scrutinized.") (ellipsis in *Cramer*). Saying that one ordinarily has no expectation of privacy in his public appearance and therefore may not be able to complain about being recorded at a given time is different from saying that one consents to being recorded merely by appearing in public. One can take into account the scope of surveillance in considering whether an expectation of privacy has been triggered, *see Jones*, *supra* (Alito, J., concurring), but that becomes more difficult if public appearance has simply been deemed to be consent, even if the boundaries of consent are dictated by circumstances. Moreover, the State's contention that the boundaries of "consent" may be dictated by the circumstances might also raise the question of whether the statute is unconstitutionally vague.

Moreover, courts should be circumspect about using a "narrowing construction" that actually broadens the meaning of a term.[89] The State seeks to narrow the improper-photography statute by broadening the scope of the word "consent." Such a broadening appears to be unrealistic, especially given the meaning of consent in other contexts and the wide applicability of the Penal Code definition of "consent" to statutes in the Code and to statutes outside the Code.[90] We decline to construe the term "consent" in the manner the State suggests.[91]

### 5. *Scott v. State*

The State contends that the present case is like *Scott v. State*, where this Court upheld the telephone-harassment statute in the face of a First Amendment facial challenge. *Scott* held that the telephone-harassment statute did not implicate the First Amendment because it was directed only

---

[89] *State v. Dronso*, 90 Wis. 2d 110, 115-16, 279 N.W.2d 710, 713 (Wis. Ct. App. 1979) ("Here the state would have this court uphold the constitutionality of [the statute] by interpreting the operative words 'intent to annoy' to mean and include the following: obscene or lewd language employed, threats of injury to people or damage to property, attempts to extort money, or invasion of privacy through repeated calls. Apparently it is the state's contention that this kind of interpretation of the operative words 'intent to annoy' found in the statute is a constitutionally valid method of narrowing its construction. Such is not the case. For a court to make a determination in this manner, it would excessively broaden the scope of the words 'intent to annoy' to the point of judicial legislation in its worst form. This statute is not readily subject to a narrowing construction as required.").

[90] *See Stevens*, 559 U.S. at 479 (faulting the government for an "unrealistically broad reading of the exceptions clause" found in the depiction-of-cruelty statute and holding, instead, that the term "serious value" should be read in conformity with its meaning in other contexts).

[91] It is worth noting that the State's interpretation of the statute, if accepted, would appear likely to ultimately result in appellant's acquittal, given that the wording of at least some of the counts in the indictment suggests that appellant's recordings were of purely public activities. If the State's position were correct, however, appellant would have to wait for the end of trial, or even for an appeal after trial, for the resolution of a sufficiency-of-the-evidence claim regarding whether the recordings were made "without consent." *See Ellis*, 309 S.W.3d at 79 ("Generally, pretrial habeas is not available to test the sufficiency of the charging instrument or to construe the meaning and application of the statute defining the offense charged.").

at persons who (1) with the specific intent to inflict emotional distress, (2) repeatedly used a telephone to invade another's personal privacy, and (3) did so in a manner reasonably likely to inflict emotional distress.[92] To the extent that the proscribed conduct was communicative, it was found not to be protected by the First Amendment because it "invades the substantial privacy interests of another (the victim) in an essentially intolerable manner."[93]

We find *Scott* to be distinguishable in at least two respects. First, the statute at issue in *Scott* penalized communications conveyed by telephone, a relatively private channel of communication. The Supreme Court's seminal case regarding Fourth Amendment expectations of privacy arose from the interception of a telephone conversation.[94] Several courts have held that a telephone either is a nonpublic forum[95] or implicates privacy even in the face of First Amendment concerns.[96] Government has greater leeway to regulate when a nonpublic forum is involved[97] or when serious

---

[92] 322 S.W.3d at 669-70.

[93] *Id.* at 670.

[94] *See Katz v. United States*, 389 U.S. 347 (1967).

[95] *City of Seattle v. Huff*, 111 Wash.2d 923, 927, 767 P.2d 572, 574 (1989).

[96] *State v. Koetting*, 616 S.W.2d 822, 826-27 (1981) ("To require a telephone subscriber to deny himself the use of the system to avoid harassment is clearly unreasonable and the state has a legitimate interest in providing a means of punishing those who would abuse the system and flagrantly infringe upon the privacy and solitude of another."); *People v. Weeks*, 197 Colo. 175, 591 P.2d 91 (1979) ("A ringing telephone is an imperative which, in the minds of many, must be obeyed with a prompt answer . . . . Once a telephone has been answered, the victim is at the mercy of the caller until the call can be terminated.").

[97] *Board of Airport Commissioners v. Jews for Jesus*, 482 U.S. 569, 573 (1987); *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 800, 811 (1985).

privacy interests are implicated.[98]

Second, the telephone-harassment statute applied only to a defendant who intended to inflict emotional harm on the victim. The First Amendment limits the government's ability to impose sanctions for even the intentional infliction of emotional distress, but those limits are less rigorous when the speech involves matters of purely private concern.[99]

By contrast, the statute at issue in the present case is not limited to expressive activity that occurs in relatively private settings nor to activity that intentionally inflicts emotional harm on the victims. Making photographs or visual recordings can be criminal even if it occurs on a public street,[100] and there is no requirement that the defendant intend any sort of harm, emotional or otherwise, to the person photographed or recorded.

The State suggests, albeit under the scrutiny part of the First Amendment analysis, that the improper-photography statute protects privacy interests by "protecting individuals from invasive covert photography" and by "protecting individuals from having their images unconsensually exploited for the sexual gratifications of others." The State is correct; the statute does protect individuals in these ways. But this part of the State's analysis has been undermined by our rejection of the State's suggestion that we construe the statute to exclude photographs and visual recordings

---

[98] *Snyder v. Phelps*, 131 S. Ct. 1207, 1220 (2011) (quoting *Cohen v. California*, 403 U.S. 15, 21 (1971)) ("to shut off discourse solely to protect others from hearing it is . . . dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner").

[99] *Id.* at 1215.

[100] *See Lo*, 424 S.W.3d at 25 n.71 (quoting *Nyabwa*, 366 S.W.3d at 712 (Keller, P.J., dissenting) ("But in the statute before us, the person photographed could be a fully-clothed adult walking down a public street.")).

of people in public. And with respect to photography or visual recordings of people in public, we do not find the State's asserted privacy interests to be particularly substantial. A person who walks down a public street cannot prevent others from looking at him or her with sexual thoughts in their heads. "[P]rivacy interests fade once information already appears on the public record."[101] Protecting someone who appears in public from being the object of sexual thoughts seems to be the sort of "paternalistic interest in regulating the defendant's mind"[102] that the First Amendment was designed to guard against.[103] We also keep in mind the Supreme Court's admonition that the forms of speech that are exempt from First Amendment protection are limited, and we should not be quick to recognize new categories of unprotected expression.[104] We conclude that the improper-photography statute implicates First Amendment expression on its face.

### C. What is the Level of Scrutiny?

#### 1. *The Standards*

In the First Amendment context, there are two levels of scrutiny: strict scrutiny and intermediate scrutiny. Strict scrutiny applies when a statute constitutes a content-based regulation of expression.[105] Under strict scrutiny, a regulation of expression may be upheld only if it is

---

[101] *Florida Star v. B.J.F.*, 491 U.S. 524, 532 n.7 (1989).

[102] *See Osborne*, 495 U.S. at 109.

[103] An argument might perhaps be made that one who is photographed without consent is in a sense a "captive audience" because of the difficulty of preventing such photography. But, by its own estimation, the Supreme Court has applied the captive audience rationale sparingly, generally limiting its application to unwanted expressive activity directed at one's home. *Snyder*, 131 S. Ct. at 1220.

[104] *Entertainment Merchants Ass'n.*, 131 S. Ct. at 2733-34.

[105] *Id.* at 2738; *Lo*, 424 S.W.3d at 19.

narrowly drawn to serve a compelling government interest.[106]  In this context, a regulation is

"narrowly drawn" if it uses the least restrictive means of achieving the government interest.[107]

The Supreme Court has two lines of cases that apply intermediate scrutiny.  To cases

involving expressive conduct (conduct that is not inherently expressive but can be expressive on the

facts of a given case), the Court applies the *O'Brien* test, which requires that (1) the regulation

furthers an important or substantial government interest, (2) the government interest is unrelated to

the suppression of free expression, and (3) incidental restrictions on First Amendment freedoms are

no greater than essential to the furtherance of the government interest.[108]  Other cases, such as *Ward*

*v. Rock Against Racism*, hold that a regulation of the time, place, or manner of expression is

permissible if it is (1) content neutral, (2) serves a significant government interest, (3) is narrowly

tailored, and (4) leaves open ample alternative channels of communication.[109]  The test for

reasonable time, place, and manner restrictions applies even to pure speech or inherently expressive

conduct.[110]

The Supreme Court has held that the *O'Brien* test "is little, if any, different from the standard

---

[106]     *Entertainment Merchants Ass'n.*, 131 S. Ct. at 2738; *Lo*, 424 S.W.3d at 19.

[107]   *Playboy*, 529 U.S. at 813; *Lo*, 424 S.W.3d at 15-16, 19.

[108]  *Turner Broadcasting System v. Federal Communications Commission*, 512 U.S. 622, 662 (1994); *United States v. O'Brien*, 391 U.S. 367, 376-77 (1968) (test applicable "when 'speech' and 'nonspeech' elements are combined in the same course of conduct").

[109]  491 U.S. 781, 791 (1989).

[110]     *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 298 n.8 (1984) ("Reasonable time, place, or manner restrictions are valid even though they directly limit oral or written expression.").

applied to time, place or manner restrictions."[111]  Under either intermediate-scrutiny test, the

regulation "need not be the least speech-restrictive means of advancing the Government's

interests."[112] The requirement of narrow tailoring is satisfied if the regulation promotes a substantial

governmental interest that would be achieved less effectively absent the regulation.[113] The regulation

is considered "narrowly tailored" for intermediate-scrutiny purposes, "[s]o long as the means chosen

are not substantially broader than necessary to achieve the government's interest."[114]

### 2. *Which Standard of Scrutiny Applies?*

Because we have determined that the activity proscribed by the statutory provision at issue

is inherently expressive, *O'Brien* does not apply.  To be subject to intermediate scrutiny, then, the

provision must be a content-neutral time, place, or manner restriction.  At least arguably, the

provision at issue here regulates the *manner* of expression, and we will assume it to be such for the

purpose of discussion.  We turn then, to whether the statutory provision is content based or content

neutral.  Under the standards articulated above, if a law is content based, then strict scrutiny applies,

but if it is content neutral, intermediate scrutiny applies.

Generally, a law is considered to be content based if it distinguishes "favored speech from

disfavored speech on the basis of the ideas or views expressed."[115]  "If it is necessary to look at the

---

[111]  *Johnson*, 491 U.S. at 407; *Ward*, 491 U.S. at 798; *Clark*, 468 U.S. at 298.

[112]  *Turner Broadcasting*, 512 U.S. at 662 (*O'Brien* test); *see also Ward*, 491 U.S. at 797-98 (time, place, or manner restrictions).

[113]  *Turner Broadcasting*, 512 U.S. at 662;  *Ward*, 491 U.S. at 799.

[114]  *Ward*, 491 U.S. at 800.

[115]  *Turner Broadcasting*, 512 U.S. at 643; *Lo*, 424 S.W.2d 15.

content of the speech in question to decide if the speaker violated the law, then the regulation is content-based."[116]  For example, a statute that prohibits an adult from communicating with a minor via the internet is content-neutral, but a statute that prohibits an adult from communicating with a minor via the internet in a sexually explicit manner is content-based.[117]

In some situations, a regulation can be deemed content neutral on the basis of the government interest that the statute serves, even if the statute appears to discriminate on the basis of content.  These situations involve government regulations aimed at the "secondary effects" of expressive activity.[118]  In this type of situation, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."[119]  The government regulation at issue need only be justified without reference to the content of the regulated speech.[120]

Two classic examples of the "secondary effects" rule are the sound ordinance in *Ward* and the zoning ordinance in *Renton.*  In *Ward*, the Supreme Court held that an ordinance that sought to control the volume level of entertainment performances at a public venue was content neutral, even though volume is sometimes an expressive aspect of a performance.[121]  Controlling noise levels to

---

[116]  *Lo*, 424 S.W.3d at 15 n.12.

[117]  *Id.*

[118]  *City of Renton v. Playtime Theatres*, 475 U.S. 41, 47 (1986).

[119]  *Ward*, 491 U.S. at 791.

[120]  *Id.*; *Renton*, 475 U.S. at 48.

[121]  *See Ward*, 491 U.S. at 791-93.

avoid undue intrusion into residential areas was a content-neutral justification for the regulation.[122] In *Renton*, the Supreme Court held that a zoning ordinance for adult theaters was content neutral because it was aimed at the effects of such theaters on the surrounding community.[123]

Ordinarily, however, the government's purpose in enacting the statute is not controlling. "[W]hile a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary to such a showing in all cases . . . . Nor will the mere assertion of a content-neutral purpose be enough to save a law which, on its face, discriminates based on content."[124]

The amicus argues that the improper-photography statute discriminates on the basis of content because it applies only to the photographing and recording of people, as opposed to other subjects, such as animals, landscapes, and buildings. The improper-photography statute applies only when the actor photographs or records "another,"[125] and the Penal Code elsewhere defines "another" to mean "a person other than the actor."[126] The inquiry, however, is not that simple.

In *Regan v. Time*, the Supreme Court upheld size and color limitations on depictions of

---

[122]  *Id.* at 792.

[123]  *Renton*, 475 U.S. at 47-48.

[124]  *Bartnicki v. Vopper*, 532 U.S. 514 (2001) (quoting *Turner Broadcasting*, 512 U.S. at 642).

[125]  TEX. PENAL CODE § 21.15(b)(1).

[126]  *Id.* § 1.07(a)(5). "Person" is defined as "an individual, corporation, or association," *id.* § 1.07(a)(38), and "individual" is defined as "a human being who is alive, including an unborn child at every stage of gestation from fertilization until birth," *id.* § 1.07(a)(26).

money as content-neutral manner restrictions.[127]  These size and color limitations applied only to depictions of money, and not to depictions of other things, such as cars or flowers, but that fact did not cause the size and color limitations to be content based.  The reason this is so may be that money has a special legal status, given Congress's power to coin money and punish counterfeiting.[128]  Depictions of cars and flowers do not implicate the counterfeiting concerns that are implicated by depictions of money.

Likewise, people have a special legal status not enjoyed by other subjects such as animals, landscapes, and buildings, and one aspect of this special legal status involves the issue of consent.  "Consent" as a legal concept is meaningful only with respect to people.  Landscapes and buildings cannot consent or withhold consent, and, legally, animals cannot do so either.  Only people can consent, and even when a particular person cannot consent, because of an actual or legal lack of capacity, someone else generally has the right or duty to consent on his behalf.  So, the improper-photography statute discriminates on the basis of the non-consensual nature of the defendant's activity, and that basis, *by itself*, is a content-neutral distinction.

But the statutory provision at issue does not penalize all non-consensual acts of taking photographs and making visual recordings.  A statute that did so would be content neutral, but it is doubtful that such a broad prohibition would satisfy intermediate scrutiny.[129]  The provision at issue

---

[127]  *Time*, 468 U.S. at 655-56, 658.

[128]  *See id.* at 643.

[129]  *See Gilleo*, 512 U.S. at 55-57 (stating, with respect to regulation banning signs at residences: "Our prior decisions have voiced particular concern with laws that foreclose an entire medium of expression."); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61 (1981) (improper to ban live entertainment throughout the community).  *See also Frisby v. Schultz*, 487 U.S. 474, 485 (1988) ("A complete ban can be narrowly tailored, but only if each activity within the proscription's scope

here penalizes only a subset of non-consensual image and video producing activity—that which is done with the intent to arouse or gratify sexual desire. We find this discrimination to be content based. As we have explained above, sexual thoughts are included within the protection of the First Amendment. By discriminating on the basis of the sexual thought that underlies the creation of photographs or visual recordings, the statute discriminates on the basis of content.

It is no answer that the statute merely discriminates on the basis of the thought behind the speech rather than the speech itself. As our discussion above shows, thought is intertwined with expression and is also protected by the First Amendment. Moreover, the Supreme Court has concluded on several occasions that a purpose or culpable mental state required by a statute caused it to be content based. In *Regan v. Time*, the Court held that the part of the statute that restricted depictions of money to certain purposes was a content-based restriction.[130] In *R.A.V. v. City of St. Paul*, the Court held that an ordinance discriminated on the basis of content when it imposed criminal liability for engaging in expressive activity that "one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender."[131] And in *Texas v. Johnson*, the Court held that the flag-burning statute, which imposed

is an appropriately targeted evil.").

[130] *Time*, 468 U.S. at 644 (statute allowed the "printing, publishing, or importation . . . of illustrations of . . . any . . . obligation or other security of the United States . . . for philatelic, numismatic, educational, historical, or newsworthy purposes in articles, books, journals, newspapers, or albums. . . .") (ellipsis in *Time*), 648 ("A determination concerning the newsworthiness or educational value of a photograph cannot help but be based on the content of the photograph and the message it delivers."), 649 (purpose requirement was content based).

[131] *R.A.V. v. City of St. Paul*, 505 U.S. 377, 380-81 (1992) (finding the following statute to be a content-based restriction: "Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment

liability for conduct the actor "*knows* will seriously offend one or more persons likely to observe or discover his action,"[132] was content based because it punished mistreatment of the flag that was intentionally designed to seriously offend other individuals.[133] The Court rejected the State's argument that the statute was a content-neutral law aimed only at "the actor's intent and not at the communicative impact of his actions" and found "the distinction between Texas' statute and one dependent on actual audience reaction too precious to be of constitutional significance."[134]

Nor may we find the statute content neutral on the basis of a "secondary effects" theory. It is the sexual content of the expression, not any secondary effect of taking photographs or making visual recordings, that the statute seeks to prevent. Although the State claims that the statute seeks to protect privacy, the only sense in which the statute *necessarily* protects privacy is by protecting an individual from being the subject of someone else's sexual desires. But this type of protection regulates the primary effect of speech because it is simply the protection against the expression of "a particularly odious message," where "the 'chain of causation' . . . *necessarily* 'runs through the persuasive effect of the expressive component' of the conduct."[135]

Because we find that the statutory provision at issue is content based, we conclude that strict scrutiny is the applicable standard.

---

in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.").

[132] 491 U.S. at 411 n.7 (emphasis in *Johnson*).

[133] *Id.* at 411-12.

[134] *Id.* at 411 n.7.

[135] *R.A.V.*, 505 U.S. at 394 n.7 (emphasis in original).

### D. Does the Statute Satisfy Strict Scrutiny?

Content-based regulations are presumptively invalid,[136] and "[i]t is rare that a regulation restricting speech because of its content will ever be permissible."[137] Even when a compelling government interest is shown, the existence of adequate content-neutral alternatives undercuts significantly any defense of such a statute.[138] And as we explained above, when a statute is content based, it may be upheld only if it is the least restrictive means of achieving the compelling government interest in question.

The State asserts an interest in protecting the privacy of those photographed or recorded. Privacy constitutes a compelling government interest when the privacy interest is substantial and the invasion occurs in an intolerable manner.[139] We agree with the State that substantial privacy interests are invaded in an intolerable manner when a person is photographed without consent in a private place, such as the home, or with respect to an area of the person that is not exposed to the general public, such as up a skirt.

But § 21.15(b)(1) contains no language addressing privacy concerns. The provision certainly applies to situations in which privacy has been violated, but that is because the provision applies broadly to *any* non-consensual act of photography or visual recording, as long as it is accompanied by the requisite sexual intent. It is obvious that the portion of the statute at issue is not the least

---

[136] *Sorrell v. IMS Health*, 131 S. Ct. 2653, 2667 (2011)(quoting *R.A.V.*, 505 U.S. at 382); *Lo*, 424 S.W.3d at 14-15.

[137] *Entertainment Merchants Ass'n.*, 131 S. Ct. at 2738 (quoting *Playboy*, 529 U.S. at 818).

[138] *R.A.V.*, 505 U.S. at 395.

[139] *Snyder*, 131 S. Ct. at 1220.

restrictive means of protecting the substantial privacy interests in question. One need only look at the next subsection of the statute—§ 21.15(b)(2)—to see an example of a provision that is in fact narrowly drawn to protect substantial privacy interests—the provision that makes it a crime to "photograph or . . . record[] . . . a visual image of another at a location that is a bathroom or private dressing room."[140]

By its very wording negating the "bathroom or private dressing room" element, the provision before us, § 21.15(b)(1), was designed as a catch-all, to reach other situations in which photography and visual recordings ought to be prohibited. But there are narrower methods of reaching such situations that address more directly the substantial privacy interests at stake. For instance, subsection (b)(2) of the statute provides an alternative culpable mental state of "with intent to . . . invade the privacy of the other person."[141] If this culpable mental state were a conjunctive element of subsection (b)(1), it would narrow the provision at least somewhat to address privacy concerns.[142] Subsection (b)(1) could also be narrowed by adding an element that requires that a person's privacy interest be invaded as a result of the place of the person recorded or the manner in which a visual recording is made. Or the legislature could designate specific places and manners that are proscribed, such as specifically proscribing the taking of a photograph of a person inside his home

---

[140] TEX. PENAL CODE § 21.15(b)(2).

[141] *Id.* § 21.15(b)(2)(B)(i).

[142] The culpable mental state need only be an alternative element of subsection (b)(2) because subsection (b)(2) already requires that the person photographed or recorded be in a place in which privacy interests are substantial—a bathroom or private dressing room. But in subsection (b)(1), the privacy culpable mental state would need to be a conjunctive element to serve a limiting function. We express no opinion on whether adding this culpable mental state as a conjunctive element would be sufficient, alone, to make subsection (b)(1) constitutional.

or the taking of a photograph underneath a person's clothing. Because less restrictive alternatives would adequately protect the substantial privacy interests that may sometimes be threatened by non-consensual photography, the provision at issue before us fails to satisfy strict scrutiny.

### E. Overbreadth

Having found the statute to be an invalid content-based restriction, we question whether we need to address overbreadth.[143] In an abundance of caution, we address whether the unconstitutional reach of the statute is substantial enough to warrant a holding of facial invalidity, despite any legitimate applications of the statute. As we explained above, § 21.15(b)(1) does apply to the situation in which a non-consensual photograph is taken of a person in a private place, such as the home, and the situation in which a photograph is taken of an area of a person's body that is not exposed to the public, such as when a photograph is taken up a woman's skirt. Assuming these to be legitimate applications of the statute, we address the overbreadth question.

The overbreadth doctrine is "strong medicine" to be employed with hesitation and only as a last resort.[144] The "overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."[145] To be held unconstitutional under the overbreadth doctrine, a statute must be found to "prohibit[] a substantial amount of protected

---

[143]   *See R.A.V.*, 505 U.S. at 381 n.3 (contrasting technical "overbreadth" claim—that regulation violated rights of too many third parties—with claim that statute restricted more speech than the constitution permits, even as to the defendant, because it was content based).

[144]   *Ferber*, 458 U.S. at 769.

[145]   *Id.* at 770.

expression."[146] The danger that the statute will be unconstitutionally applied must be "realistic."[147]

A statute is likely to be found overbroad if the criminal prohibition it creates is of "alarming breadth."[148] Such is the case with the current statute, the breadth of which has been accurately characterized as "breathtaking."[149] The statutory provision at issue is extremely broad, applying to any non-consensual photograph, occurring anywhere, as long as the actor has an intent to arouse or gratify sexual desire. This statute could easily be applied to an entertainment reporter who takes a photograph of an attractive celebrity on a public street.[150] But the statute operates unconstitutionally even if applied to someone who takes purely public[151] photographs of another for personal reasons with the requisite intent.

Although we must look to whether the improper reach of the statute is "real," as well as substantial, "[w]e would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."[152] And we can look to the prosecution before us as evidence of the

---

[146] *Free Speech Coalition*, 535 U.S. at 244.

[147] *Time*, 468 U.S. at 651 n.8.

[148] *See Stevens*, 559 U.S. at 474.

[149] *See Lo*, 424 S.W.3d at 25 n.71 (quoting *Nyabwa*, 366 S.W.3d at 712 (Keller, P.J., dissenting)).

[150] We do not address issues relating to the right of publicity of a professional actor or entertainer that might be infringed by the recording of the professional's likeness or performance. *See Keller v. Electronic Arts*, 724 F.3d 1268, 1273-1279 (9ᵗʰ Cir. 2013); *Moore v. Weinstein Co.*, 545 Fed. Appx. 405, 408-09 (6ᵗʰ Cir. 2013).

[151] By "purely public," we mean photographs of a subject who is in public where the photographed areas are exposed to the public.

[152] *Stevens*, 559 U.S. at 480.

real danger posed by the statute.[153] The record in the present case consists solely of the indictments, but the descriptions in a number of the counts suggest that the images recorded were of people in a public place (a water park) and of areas of the person that were exposed to the public (wearing swimsuits).

Moreover, we are aware of at least four appellate decisions, aside from this case, that involve the application of § 21.15(b)(1) to purely public photography.[154] In one of those cases, *Cooper v. State*, the court of appeals rather ominously stated,

> In the 50s, before the advent of video cameras and cell phone videos, a popular song advised us that standing on the corner and watching females pass by was acceptable conduct and that "you can't go to jail for what you're thinking." Watching may still be acceptable conduct, but recording that parade may violate the law in Texas today.[155]

---

[153] *See id.* ("This prosecution is itself evidence of the danger in putting faith in Government representations of prosecutorial restraint.").

[154] *See Arguellez v. State*, 409 S.W.3d 657 (Tex. Crim. App. 2013) (photographs at a swimming pool at a public park); *Ramirez v. State*, 2013 Tex. App. LEXIS 1106, *1-2 (Tex. App.–Eastland 2013, no pet.) (not designated for publication) (Defendant was observed squatting and aiming his camera at the posteriors of underage females at jewelry store at a mall. Defendant tried to hide media card containing photographs and was ultimately convicted of tampering with evidence); *Cooper v. State*, 326 S.W.3d 757, 758-59 (Tex. App.–Texarkana 2010, pet. granted to delay mandate, mandate later issued) (Video recordings were made of females walking down the sidewalk, or down the street, in front of the defendant's home or business. The subjects were fully clad and were not in a private area, but the zoom function on camera was used at various times to obtain close-ups of specific parts of female anatomy, and it was those close-ups that were used to show the defendant's intent to arouse or gratify sexual desire. Court of appeals acquitted defendant on the basis that the evidence was insufficient to show that he made the recordings.); *McKissick v. State*, 209 S.W.3d 205, 208 (Tex. App.–Houston [1ˢᵗ Dist.] 2006, pet. ref'd) (Photographs were taken of females at a beach, including those that depicted the mid-sections of two girls, between the ages of ten and twelve, "the rear end of a young female," the "crotch area of a young female," "the back of a female," and a "waist shot." A later search of defendant's home for additional evidence of improper photography yielded evidence of child pornography, and defendant was convicted of possession of child pornography.).

[155] *Cooper*, 326 S.W.3d at 757-58.

In *Arguellez*, this Court expressed its incredulity that reasonable suspicion could arise from taking photographs in a public place: "Photographs are routinely taken of people in public places, including at public beaches, where bathing suits are also commonly worn, and at concerts, festivals, and sporting events."[156] "Taking photographs of people at such venues," the Court said, "is not unusual, suspicious, or criminal."[157] We believe that this incredulity reflects more on the unreasonably expansive nature of the statute than on the conduct of the police officers.[158]

### III. CONCLUSION

We hold that Section 21.15(b)(1) of the Texas Penal Code, to the extent it proscribes the taking of photographs and the recording of visual images, is unconstitutional on its face in violation of the Free Speech clause of the First Amendment. We affirm the judgment of the Court of Appeals.

Delivered: September 17, 2014
Publish

---

[156] 409 S.W.3d at 664.

[157] *Id.*

[158] At most, *Arguellez* held that the police in that particular case did not have enough facts at the time of the stop to raise a reasonable suspicion about the elements of intent, *see id.* at 662 n.4 (holding that the perspective of the photographs—focusing on breasts, nether regions, and rear ends—could not be a basis for the stop because it was the evidence obtained from the stop), or lack of consent, *see id.* at 664 (police dispatcher was informed that an unnamed man in a described motor vehicle was seen taking photographs of people at a public swimming pool).